UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 21-cr-10104-PBS |
| | ) | |
| VLADISLAV KLYUSHIN | ) | |
| Defendant | ) | (Leave to file granted on April 5, 2022) |
| | ) | |

## APPEAL OF MAGISTRATE JUDGE'S PRETRIAL DETENTION ORDER

On January 5, 2022, Magistrate Judge Marianne B. Bowler ordered Mr. Klyushin detained before trial. Mr. Klyushin now respectfully moves this Honorable Court, pursuant to 18 U.S.C. § 3145(b), for *de novo* review and revocation of that detention order.[1]

The defense respectfully requests this Honorable Court to release Mr. Klyushin on the least restrictive conditions sufficient to reasonably assure his appearance because (1) Mr. Klyushin does not present a serious risk of flight that cannot be mitigated by less restrictive measures than pretrial detention and (2) pretrial detention, in a case of this magnitude and complexity, will impede Mr. Klyushin's and the defense's ability to prepare for trial.

Mr. Klyushin, who was arrested in Switzerland and extradited to the United States, has been in custody for more than a year.  He has been in the United States for more than three months and there is still no date on when the defense can expect to receive a complete, searchable discovery database. To date, the Government produced more than five (5) terabytes (or 5,000 gigabytes) of discovery that contains in excess of 1 million individual files.  The

---

[1] 18 U.S.C. § 3145(b) provides: "Review of a detention order. If a person is ordered detained by a magistrate, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly."

database is not currently searchable, portions require reformatting, and others need to be forensically processed.  The portions of the discovery that the Government has already forensically processed are likely unreliable, *see infra* at 24-25, compounding the difficulty of expeditiously preparing the case for trial.  Even when the Government produces a copy of the discovery in a format that could be uploaded to a discovery review platform and the defense obtains forensically formatted data, Mr. Klyushin, who seeks to participate in the preparation of his defense, will not be able to access the discovery platform given the detention facility's limitations on internet connectivity. Accordingly, pretrial release is not only warranted because there are conditions that can reasonably assure Mr. Klyushin's appearance but is also critical to counsel's ability to provide effective assistance of counsel, as well as the defendant's ability to meaningfully contribute to his defense.

## PRELIMINARY STATEMENT

Mr. Klyushin is charged with conspiracy to obtain unauthorized access to computer networks and to commit wire fraud and securities fraud, substantive wire fraud, unauthorized access to a computer, and securities fraud. Dkt. 8. The legal presumption in this case is that Mr. Klyushin should be released. To detain him before trial, the Government must prove and this Honorable Court must find that no conditions exist sufficient to reasonably assure his appearance at future court proceedings.[2]

While not a U.S. citizen, strict conditions of release as well Mr. Klyushin's desire to vigorously defend himself against the Government's allegations abate the serious risk of flight.

---

[2] The Government does not contend – and Magistrate Judge Bowler did not find – that Mr. Klyushin poses a risk of community danger if released. *See* Dkt. 34 (Magistrate Judge's Order of Detention) at 3. Mr. Klyushin is not accused of a crime of violence and has no criminal history of any kind. His detention was predicated exclusively on risk of flight. *Id.*

None of the charges against him carry a mandatory minimum term of incarceration, and Mr. Klyushin strongly believes, and intends to prove at trial, that, among other things, he never engaged or assisted in any computer intrusion of Filings Agents 1 and 2 or knowingly made any securities transactions based on material non-public information.

Moreover, pretrial detention is not necessary here. Other release conditions exist that will reasonably assure Mr. Klyushin's future appearances in court. In speculating that Mr. Klyushin may flee the United States, the Government leans heavily on the fact that he is a citizen of Russia. This, however, is not enough for the Government to meet its burden of proof. *See, e.g., United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004) (ordering pretrial release of Israeli national who resided in South Africa and had no ties to the United States); *see also United States v. Bodmer*, No. 03 CR 947 (SAS), 2004 WL 169790, at *1 (S.D.N.Y. Jan. 28, 2004) (ordering pretrial release for a non-extraditable citizen of Switzerland). The Government can point to no facts in the record showing that Mr. Klyushin is prepared, or has taken any concrete steps to flee, or that he will decline to follow the Court's orders and conditions of release. All the Government proffers is insufficient speculation of flight. Further, any ostensible concern of flight can readily and reasonably be addressed short of detention. Surely, Mr. Klyushin's status as a citizen of Russia cannot, alone, especially in a case with no presumption of detention, warrant lengthy future pretrial incarceration (in addition to the more than a year that Mr. Klyushin has already been in custody) while the defense waits for searchable discovery and prepares for trial.

The Government has already siezed Mr. Klyushin's passport, and the Court may impose other suitable conditions sufficient to secure his future appearances, including (i) the posting of property and/or other assets before he is released from custody in an amount determined

sufficient by this Honorable Court;[3] (ii) the continued surrender of his passport to the Government and an agreement not to seek or obtain any new passport during the pendency of this matter; (iii) home confinement with only access to his attorneys; (iv) 24/7 electronic GPS monitoring of Mr. Klyushin, along with additional, frequent in-person visits by Pretrial Services; (v) a restriction on his contacting any consulate, whether in-person or electronically; (vi) a ban on accessing the internet (other than a preapproved discovery review platform); (vii) a ban on possessing any internet connected telephone; and (viii) any other conditions the Court deems appropriate. If this Honorable Court believes it is necessary, it can even require Mr. Klyushin to hire, at his expense, private security to monitor his activities 24/7 and ensure his appearance as required.[4]

These same sorts of conditions have reasonably assured the appearance of multiple international defendants while allowing them to assist their attorneys with the preparation of

---

[3] Mr. Klyushin had previously proposed to execute a bond in the amount of $2.5 million secured by $1 million in cash to be deposited with the Court and $1.5 million to be secured by an apartment located in London, United Kingdom. The property in London could be sold and the proceeds of the sale could be deposited with the Court avoiding the highly unlikely "complex and lengthy legal proceedings" that concerned Magistrate Judge Bowler. *See* Dkt. 34 at 4.

[4] The defense has been in contact with Guidepost Solutions LLC ("Guidepost"), who are ready and willing to provide 24/7 monitoring services to Mr. Klyushin. Guidepost is headed by Chairman Bart Schwartz (the former Chief of the Criminal Division of the U.S. Attorney's Office for SDNY) and CEO Julie Myers Wood (a former EDNY prosecutor and former head of ICE). Guidepost is primarily staffed by former law enforcement officers, who have the training and expertise to monitor Mr. Klyushin and to assure his appearance at trial.  Guidepost has successfully provided monitoring services for defendants on pretrial release within the United States including Jeffrey Webb, *see United States v. Webb*, 15-cr-0252-RJD, Dkt. 49 (E.D.N.Y) (ordering release of a FIFA vice president and executive committee member, a citizen of the Cayman Islands, who was accused of participating in the systematic payment of over $150 million in bribes and kickbacks to obtain lucrative media and marketing rights to international soccer tournaments), and Ng Lap Seng, *United States v. Seng*, 15-cr-706-VSB, Dkt.  (S.D.N.Y.) (granting bail to defendant who had no ties to the United States, was not a U.S. citizen, did not speak English, had seemingly endless wealth with which to flee, and was an older man for whom a twenty year sentence could effectively be a life sentence).

their defense, *see infra* at 18-22. These precedents underscore the fundamental principle that, in

the United States, there is a "strong presumption against detention." *United States v. Hanson*,

613 F.Supp.2d 85, 87 (D.D.C. 2009).  In fact, "'[i]n our society liberty is the norm, and detention

prior to trial or without trial is the carefully limited exception.'" *Hanson*, 613 F.Supp.2d at 87,

*quoting United States v. Salerno*, 481 U.S. 739, 755 (1987). The same result is called for here.

## STATEMENT OF FACTS

### A.  Mr. Klyushin's History and Characteristics.

Mr. Klyushin is a forty-one-year-old husband and father of five children (ranging from

the age of four through thirteen) with no prior involvement with the criminal justice system

(other than the instant charges), no history of violating any court orders, no history of using false

identifications or engaging in obstructive conduct, and no history of drug or alcohol abuse. He

has been married to Zhannetta Kliushina for seven years, shares a close bond with his children,

and plays a prominent role in their upbringing. Mr. Klyushin comes from a humble family

background. His mother, a store clerk at a supermarket, gave birth to Mr. Klyushin when she was

18 years old. Mr. Klyushin has no ties to his father, who is not even listed on his birth certificate.

During his childhood, Mr. Klyushin's family was poor. He started working at the age of thirteen

to help provide for the family. At the age of seventeen, Mr. Klyushin went to college and

presently holds two advanced degrees. In 2002 he graduated from the Moscow Academy of

Economics and Law with a law degree. Following his graduation, he worked as an adjunct

professor in the Moscow State Linguistic University while working on the Russian-equivalent of

a PhD. He was awarded the degree of Candidate of Legal Sciences in 2006 and in 2021 he

received a Master's Degree in Management of State and Municipal Enterprises from the Russian

Presidential Academy of National Economy and Public Administration. After working for the

legal department of multiple companies, Mr. Klyushin founded the company M-13, which specializes in the field of media monitoring. Its clients include Government entities and private corporations and it has grown to employ more than 100 people. Mr. Klyushin has no experience or specialized knowledge concerning programming.

In her letter, Mr. Klyushin's wife, Zhannetta, describes Mr. Klyushin as "very loving husband, wonderful man and caring father." Letter of Zhannetta Kliushina, attached hereto as Exhibit 1. [5] Others around him, including his closest friend, similarly describe Mr. Klyushin as a responsible father that never misses milestones. Letter of Anna Cherepkova attached hereto as Exhibit 2 ("Vladislav is the best and responsible father around people I know. He never missed a single family gathering nor his children' or friends' birthday[s]. As a fat[h]er of five, he took part in preparations of every [one] of his child 's birthday parties. He comes up with competitions and activities, makes up time plan for events. Also he decorated the house for the party."); Letter of Evgeniy Buyanov, attached hereto as Exhibit 3 ("Since then, Vladislav had four more children, and despite the fact that there were five of them, he always found time for each of them, paying attention to everyone and each individually. Despite the great personal professional workload, he knew what his children live is, what they are fond of, what victories and defeats they have, what joys and experiences. He always remained a sensitive, loving, kind husband, father, friend, and man.").

Mr. Klyushin treats his "employees very warmly, not even as subordinates, but as those who are near and dear to him, friends, colleagues." Letter of Boris Leonov Exhibit 4 ("For me

---

[5] In the Detention Order, Magistrate Judge Bowler had concerns about the omission of contact information for the writers of the letters and the method of translation. Dkt. 34 at 4.  The defense has requested the writers to supplement the letters with their contact information and confirmed that the letters were originally written in English. Contact information has been redacted from the public filing and unredacted versions will be submitted to this Honorable Court.

personally, over the years Vladislav has become more than just a company leader, but a friend on whom you can always count to give an advice or help."). Many of the people closest to him recount countless stories of his assistance in their time of need:

> In December 2015, I had an accident, I fell and the joint and several bones in my foot got fractured. I told this only to my colleague in the office and called an ambulance. A colleague passed the information to Vladislav, and he immediately sent a driver and ordered to take me to the best trauma center in our entire country. In fact, he paid out of his own funds for an expensive emergency operation and further treatment, and only thanks to his quick response and generosity, I did not become disabled and can still walk. He did all this out of the goodness of his heart. He never asked for any reimbursement of costs, and in general never touched upon the cost of treatment in our further communication.
>
> A similar situation happened with my colleague who, as a result of an epileptic seizure, received a compression fracture of the spine. It was also only thanks to Vladislav that he did not become disabled.

Exhibit 4.

> The most revealing and defining story about Vladislav for me happened during my second year in the company…. One night I was awoken by a phone call from one of my colleagues who's fallen sick: he had an asthma attack and was periodically losing consciousness, he couldn't say his address or call anyone else. So the first thing I did was to call Vladislav for help. And he came through. He calmed me down, called the ER and organized the best medical care for my colleague. After that I fully understood that he wasn't someone who gave fake speeches about the importance of becoming a "work family", he really did care….

Letter of Alex Doronina, attached hereto as Exhibit 5; *see also* Letter of Olga Parshkova, attached hereto as Exhibit 6 ("I broke my leg, needed surgery. Vladislav put me in the best clinic, to the best doctor and paid for the operation and treatment. Thanks to him, I recovered. Three years ago Vladislav helped in the repair of the Sretensky Monastery in Moscow. …Vladislav repaired everything for them, of course, free of charge.").

Mr. Klyushin is a deeply caring and generous person that puts others before himself. Indeed, when the global pandemic struck and businesses suffered, many let their employees go. Mr. Klyushin, however, continued to employ everyone at their prior salaries. And, even when his

company lost contracts because of his highly publicized arrest, Mr. Klyushin injected the company with his own funds to cover expenses, including employee salaries. *See* Letter of Aleksandr Badikov, CEO of M-13, attached hereto as Exhibit 7

Clearly, there is much to admire in Vladislav Klyushin.

**B.  Allegations Against Mr. Klyushin and the Magistrate Judge's Detention Order.**

Mr. Klyushin was charged by complaint on March 20, 2021, with conspiracy to obtain unauthorized access to computer networks and to commit wire fraud and securities fraud. *See* Dkt. 1.  The complaint was subsequently replaced with a four-count Indictment on April 6, 2021, charging violations of 18 U.S.C. § 371, 18 U.S.C. §§ 1343, 18 U.S.C. §§ 1030(a)(4), and 15 U.S.C. §§ 78j(b) and 78ff(a). *See* Dkt. 8.  Mr. Klyushin is accused of conspiring with Ermakov, Rumiantcev, and two-additional co-conspirators Irzak and Sladkov (who are not indicted in this case, *see* Dkt. 1-1 at 2), to obtain unauthorized access to the computer networks of two filing agents between January 2018 and September 2020 and subsequently using that non-public information to place trades in the stock market.

On March 21, 2021, Mr. Klyushin was arrested in Switzerland while en route to a family vacation. In Switzerland, Mr. Klyushin was denied bail and was held alone in a cell for more than twenty-two hours per day. He was allowed to leave the cell for less than two hours per day and was allowed to speak to his family for less than one hour per month. His telephone contact with his counsel was similarly limited to less than one hour per week.[6]

---

[6] The April 30, 2021, Switzerland Federal Criminal Court, Appeals Chamber decision that found detention pending Mr. Klyushin's extradition was warranted was based on the presumption that defendants subject to extradition remain "in custody during the entire extradition proceedings," Decision at 4, and that the proposed monetary bail package of 1,500,000 CHF (approximately $1,650,000 USD) was insufficient. *See* Decision at 9 ("In order to avert the flight risk sufficiently, alternative measures for the arrest with a view to extradition … are only considered suitable in combination with the payment of a substantial bail amount …. [t]he bail in the

Mr. Klyushin was extradited to this District on December 18, 2021, and the Government moved for Mr. Klyushin's detention on December 20, 2021. Detention hearings were held on December 22, 2021, and January 5, 2022.  Mr. Klyushin was detained following the January 5, 2022, hearing and a written order of detention was issued on January 24, 2022. Dkt. 34. In total, Mr. Klyushin has been detained for over a year and will likely be detained for a substantial, additional period as the defense continues to receive and review discovery and prepare for trial in this complicated matter.

In her detention order, Magistrate Judge Bowler did not find that Mr. Klyushin poses a danger to any person or community; indeed, the Government did not even contend Mr. Klyushin would be a danger if released. *See* Dkt. 34. The reason alleged for pretrial detention was serious risk of flight. *Id.* at 2. Detention was based on Mr. Klyushin's Russian citizenship and lack of ties to the United States, the lengthy period of incarceration and the significant financial consequences that he faces if convicted; his extensive international travel; as well his substantial means and degree of sophistication. *See* Dkt. 38 at 4.

## **ARGUMENT**

I.     **THE DETENTION ORDER SHOULD BE REVOKED BECAUSE THERE ARE CONDITIONS SHORT OF PRETRIAL DETENTION THAT CAN REASONABLY ASSURE MR. KLYUSHIN'S FUTURE APPEARANCES IN COURT.**

   **A.  The Applicable Legal Standard and the Presumption in Favor of Bail.**

---

amount of 1,500,000.00 CHF … is not to be considered substantial."). As an initial matter, Mr. Klyushin is no longer presumed detained. While the Switzerland court noted that it could not confirm Mr. Klyushin's financial representations, Decision at 9, Mr. Klyushin declares that he has fully disclosed his assets to pretrial services and, as added assurance, this Honorable Court could require, as a condition of bail and prior to his release, for him to produce an audited financial statement prepared by a reputable United States based accounting firm.

Incarceration before trial "substantially impacts the quality of the[] defense" and "increase[s] the likelihood that the detainee will be convicted, imprisoned, and subjected to prolonged deprivation of liberty, privacy, and other fundamental elements of human existence." Samuel R. Wiseman, *"Pretrial Detention and the Right to be Monitored,"* 123 YALE L. J. 1344 (2014). Accordingly, '[o]ur system of criminal justice embraces a strong presumption *against* detention." *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.D.C. 2009) (emphasis added). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.). Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Id.* at 1405.

Consistent with these principles, the presumption of innocence afforded to every defendant, and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure [1] the appearance of the person as required and [2] the safety of any other person and the community." 18 U.S.C. § 3142(b) and (c)(1)(B). "In common parlance, the relevant inquiry is whether the defendant is a 'flight risk' or a 'danger to the community.'" *United States v. Vasquez-Benitez*, 919 F.3d 546, 540 (D.C. Cir. 2019).

Where the Government moves for detention based on flight risk, the Government must satisfy a dual burden of proof:

> First, [the Government] must establish that the defendant, if released, presents an actual risk of flight. Assuming it satisfies this burden, the [G]overnment must then

demonstrate by a preponderance of the evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court.

*United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007) (reversing district court order of detention of defendants, who were natives of Indonesia, and ordering release despite defendants' "strong motive to flee" because of serious charges and "strong" evidence of guilt, despite finding that defendants faced "lengthy term of incarceration" if convicted, despite finding defendants possessed "ample means to finance flight," despite finding that defendants "maintained strong family ties to their native countries as well as personal and professional ties to various locations in Europe and the Middle East," and despite finding that defendants "could, with relatively little disruption, continue to operate their highly lucrative business from any number of overseas locations"). In other words, "[e]ven if the Court concludes the government proves by a preponderance of the evidence that release on personal recognizance will not reasonably assure the appearance of the defendant as required, the law still favors pre-trial release 'subject to the least restrictive further condition, or combination of conditions, that the court determines will reasonably assure the appearance of the person as required.'" *Sabhnani*, 493 F.3d at 75; *United States v. Berrios-Berrios*, 791 F.2d 246, 250 (2d Cir. 1986) (emphasizing that the "requirement that courts expressly consider alternative conditions is central to the Bail Reform Act").

When conducting its inquiry to ensure the "flight risk" is so serious that detention is required, the Court must consider the factors enumerated in 18 U.S.C. § 3142(g), including [1] the nature and circumstances of the offense charged, [2] the weight of evidence against the defendant, and [3] the history and characteristics of the defendant. *See* 18 U.S.C. § 3142(g); *Sabhnani*, 493 F.3d at 75. Because pretrial detention is truly a last resort, a court faced with the issue must "make explicit their findings with regard to the adequacy [or inadequacy] of possible

conditions for release." *United States v. Coonan*, 826 F.2d 1180, 1186 (2d Cir. 1987). The Court applies a *de novo* standard of review to the Magistrate Judge's detention order. *See United States v. Koenig*, 912 F.2d 1190, 1192-1193 (9th Cir. 1992) (in reviewing a magistrate's detention order, a district court "should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference").

Mr. Klyushin respectfully submits that an analysis of the relevant statutory factors supports pretrial release; even should this Honorable Court conclude the defendant presents an actual risk of flight, certainly some combination of conditions exist that will ***reasonably assure his appearance as required***. *See Hansen*, 108 Fed.Appx. at 332 ("The structure of the bail statute mandates every form of release be considered before detention may be imposed. That structure cannot be altered by building a 'guarantee' requirement atop the legal criterion erected to evaluate release conditions in individual cases") (*quoting United States v. Orta*, 760 F.2d 887, 892 (8th Cir.1985)).

### B.  Mr. Klyushin's History and Characteristics Strongly Support His Release.

As shown in the seven letters of support from family and friends accompanying this Motion, Mr. Klyushin is a beloved husband, father, and friend with no an admirable history of kindness, good deeds, and keeping his promises, and, notably, no criminal history.  Mr. Klyushin is additionally an educated and well-traveled international businessman, who relies on his reputation for work. He understands that by potentially fleeing these defensible charges he risks not only his reputation and his business, but also further prosecution which carries a maximum penalty of ten additional years of imprisonment and the real risk of an enhanced sentence by this Honorable Court in this matter if he is not acquitted. That Mr. Klyushin travelled extensively under his own name, using legitimate travel documents, shows a lack of knowledge or

sophistication that predisposes him to clandestine flight. His law-abiding history and personal characteristics militate against serious flight risk and strongly support pretrial release as both show he will abide by any conditions imposed and will appear in court as needed in this matter. *See, e.g., United States v. Chimurenga*, 760 F.2d 400, 402 (2d Cir. 1985) (upholding trial court's finding that defendant was not a flight risk, despite strong evidence of involvement in armed robbery, where defendant had no criminal record and was in school).

### C.  The Nature and Circumstances of the Offense Charged Against Mr. Klyushin Support His Release.

Likewise, both the nature of these non-violent charges and the significant defenses available to Mr. Klyushin support his pretrial release.

The Government's case is entirely circumstantial, and it has provided little to support its allegations of wrongdoing by Mr. Klyushin. Indeed, despite searches by the Government and the Swiss authorities of Mr. Klyushin's phones and computers, there was no evidence – in contrast to two alleged co-conspirators, Irzak and Sladkov – that Mr. Klyushin accessed or possessed any earnings report prior to their public release. *See* Letter from Swiss Authorities, attached hereto as Exhibit 8.  Similarly, there is no evidence that Mr. Klyushin ever communicated with or even knew Irzak and Sladkov or that he traded in connection with them.  That Mr. Klyushin did not know Irzak, Sladkov, or Ermakov at the time of the start of the alleged intrusions is undeniable. The Government's own reports – to the extent they are accurate – of Mr. Klyushin's phone conclusively indicate that Mr. Klyushin did not have Ermakov as a contact in his phone until March of 2018 and never had Irzak or Sladkov in his phone book. *See* Exhibit 9. Similarly, there is no evidence that Mr. Klyushin accessed the networks of Filing Agents through his devices. Mr. Klyushin did not place a single trade and had no trading account until June of 2018, despite the Government alleging that Filing Agent 2 was compromised as early as October 2017. *See*

Exhibit 10. The Government's supposition that Mr. Klyushin was somehow involved in hacking and trading from January 2018 is unfounded. It presupposes that Mr. Klyushin went through the great effort of obtaining material non-public information for many months without having the means, *i.e.,* a trading account, to use such information.  Much of the Government's focus is similarly on the fact that Mr. Klyushin and other co-conspirators traded ahead of earnings reports, which is undeniably a common trading strategy amongst traders. *See e.g., https://www.fidelity.com/viewpoints/active-investor/trading-earnings*. He, like any trader, suffered losses on stocks, including on transactions where the Government asserts that he had insider information. For example, for the Avent transaction on January 23, 2020, referenced in the Indictment at ¶ 36 and 37, Mr. Klyushin and his company lost approximately $15,000.  The Government similarly focuses on gains as a result of transactions in Tesla stock in October of 2018, Indictment at ¶ 22-24, but ignores $500,000+ losses in the stock on different occasions.

Certainly, this case is far from those cases where the weight of evidence is so overwhelmingly against the defendant that a reasonable presumption exists that he or she would rather flee than face an inevitable conviction. *Cf. United States v. Jackson*, 823 F.2d 4, 6 (2d Cir. 1987) (overwhelming evidence from nine different confidential sources to support allegations, including first-hand testimony of defendant's involvement in heroin deals); *United States v. Duncan*, 897 F. Supp. 688, 692 (N.D.N.Y. 1995) (five confidential informants willing to testify that defendant supplied, received, packaged, prepared, and sold cocaine in various forms for at least two years). Here, no such overwhelming evidence exists, and Mr. Klyushin, who is considered innocent until proven otherwise, intends to vigorously contest the charges against him.

Importantly, the charges at issue have no mandatory minimum and, in opposing release,

the Government improperly inflates the gravity of the claimed offenses, and with it the advisory

guidelines range by giving itself the benefit of every doubt, *i.e.* that 2B1.1 guideline is

appropriate, proscribing a gain of $82.5 million (a figure that is alleged by the SEC, not the

USAO), [7] and adding a whole set of enhancements. *See* Dkt. 23 at 10. With these assumptions,

the Government argues that Mr. Klyushin's sentencing exposure is 262 to 327 months.  The

Government's only explanation for why the potentially more appropriate 2B1.4 Insider Trading

Guideline – which would reduce Mr. Klyushin's sentencing exposure 121 to 151 months

assuming *arguendo* the same gain figure applies –is that it charged wire fraud in count two,

which alleges the unauthorized intrusion of Filing Agent 2's network, the predicate facts for

which entirely overlap with the allegations in count three charging a violation of 18 U.S.C. §

1030(a)(4).  Rather than base its guideline calculation on loss to Filing Agent 2 as a result of the

alleged intrusion, the Government simply concludes that quantifiable loss should, instead, be the

dollar value of gains from insider trading. *See* 2B1.1 Application Note 3(B) ("The court shall use

the gain that resulted from the offense as an alternative measure of loss only if there is a loss but

it reasonably cannot be determined.").  This poorly veiled attempt to increase Mr. Klyushin's

sentencing exposure in order to deem him a serious flight risk should be rejected.

The advisory Guidelines range is just one of multiple sentencing factors and "are just

that, guidelines [...] they truly are advisory." *United States v. Douglas*, 713 F.3d 694, 700 (2d

Cir. 2013). This Court "may not presume that the Guidelines range is reasonable," but rather

"must make an individualized assessment based on the facts presented," *Gall v. United States*,

552 U.S. 38, 50 (2007), and consider "all the [sentencing] factors listed in § 3553(a)," not just

---

[7] An amount that is far higher than what Mr. Klyushin or his company made from any and all
trading.

the Guidelines range. *Pepper v. United States*, 562 U.S. 476, 490 (2011). Given the lack of criminal history and Mr. Klyushin's exemplary personal history, there is no reason for the Government – or Mr. Klyushin – to presume or anticipate that the Court will impose a Guidelines sentence should Mr. Klyushin face a conviction. Indeed, many cases in this district and across the country involving the core allegations here – insider trading – have resulted in sentences significantly less that the Guidelines propose. *See https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/1c20.pdf* (In 2020, less than fifty percent of defendants sentenced for Fraud/Theft/Embezzlement were sentenced within the advisory guideline range within the First Circuit).

In any event, in finding a serious risk of flight, more is needed than the mere potential for a long sentence. *See United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988) (per curiam). Evidence supporting a finding of a serious flight risk includes skill in avoiding surveillance, prior flight from law enforcement, and use of aliases. *Id.* None of these risk factors are present here; Mr. Klyushin always traveled openly and under his own name and has never fled or tried to circumvent court orders.

To flee, Mr. Klyushin would have to do far more than simply get on a plane or a boat. He, a person with no criminal history, would have to break home confinement, all while evading government monitoring of his ankle monitor and any checks at multiple borders. He would forfeit all the assets that he has posted for bail and would forfeit any rights to the assets that the Government has already seized. And Mr. Klyushin would be doing all this to avoid fighting charges of non-violent crimes that include no mandatory minimums and to which he has reasonable defenses. This irreconcilable with Mr. Klyushin's lack of criminal history, his

commendable character, and with the charges set forth herein. Mr. Klyushin is not a flight risk of any kind, let alone a serious one. Instead, he has every incentive to continue to appear in court and fight the charges against him.

Clinching the matter, the Court may easily set conditions that address any serious flight risk. The standard is not a 100% certainty. The Bail Reform Act merely requires conditions that ameliorate the risk of flight and "reasonably assure" a defendant's return to court. *See* 18 U.S.C. § 3142(b) and (c)(1)(B); *United States v. Madoff*, 586 F.Supp.2d 240, 249 (S.D.N.Y. 2009) (Bail Reform Act "does not require that the risk be zero, but that conditions imposed 'reasonably assure' appearance"). Here, the Court readily may set a bail package that features a series of meaningful bail conditions that will deter any serious flight risk and reasonably assure Mr. Klyushin's return to court. Just as the defense proposes, Mr. Klyushin's release can be conditioned on home detention, location monitoring, travel restrictions, computer restrictions, and internet restrictions. The Government cannot persuasively contend that these thoughtful conditions, together with any other the Government or the Court may suggest, will be insufficient to reasonably assure Mr. Klyushin's return to court.

### D. Bail Conditions Readily Exist That Will Deter Any Serious Flight Risk and Reasonably Assure Mr. Klyushin's Return to Court.

The Government's "flight risk" analysis – which was accepted by the Magistrate Judge in the Detention Order – essentially begins and ends with the fact that Mr. Klyushin is not a U.S. citizen and has insufficient ties to the United States or this district.  Russian citizenship alone, however, cannot be a  basis for detainment.[8] Otherwise citizens of non-extraditable countries – a

---

[8] Assuming *arguendo* that Mr. Klyushin also had a U.S. citizenship, the Government would still likely argue, as it has in the past, that Russian citizenship alone creates an overwhelming risk of flight. *See* Dkt. 27 (citing additional authority).

category of individuals not presumed to be detained by the Bail Reform Act – would be incarcerated prior to trial. In asserting that Russian citizenship makes Mr. Klyushin a serious flight risk, the Government ignores both the difficulty of travel because of the COVID-19 pandemic and that Mr. Klyushin has no travel documents.  Importantly, the possibility of travel between the United States, Europe, and Russia have substantially changed since the Magistrate's Detention Order. Travel between the United States/Europe and Russia has effectively been banned. *See* https://www.businessinsider.com/map-shows-countries-that-closed-airspace-russia-over-ukraine-war-2022-3  ("33 countries have blocked Russian planes from their airspace, including US, Canada, and the EU…. Putin retaliated on Monday by closing Russian airspace to 36 countries."). The Magistrate Judge was similarly concerned by the notion that "[t]he lack of official travel documents has not been a deterrent to flight by other foreign nationals who have appeared before this court." Dkt. 34 at 4.  This, however, presupposes that Mr. Klyushin, if released from custody, will purchase counterfeit travel documents or avoid passport and border controls to flee the jurisdiction, and thus becoming a fugitive. Such an attenuated and highly speculative concern does not require incarceration, but rather the setting of appropriate bail conditions.

The Government is fully able to monitor and regulate entry and egress from the United States and flag Mr. Klyushin should he attempt to leave the United States – just as the Government did when he entered Switzerland prior to his arrest.  In this regard, the Government can adduce no evidence that Mr. Klyushin has any skill or experience in traveling under a false name or otherwise evading border controls. *See, e.g., Friedman*, 837 F.2d at 49 (per curiam) (finding such skills and experience material in assessing serious flight risk). If released, the Government will also likely keep close watch of Mr. Klyushin believing that he has

consequential ties to the Russian government, *see* Dkt. 23 at 11, and significant ties to his co-defendant Ermakov, who is additionally indicted in the 2016 United States elections hacking and the hacking of international anti-doping agencies, sporting federations, and anti-doping officials. *See* Dkt. 1-1 at 4. The FBI had enough resources to remove Mr. Klyushin to this district using a private plane, multiple Government agents (approximately six U.S. agents), and assistance from Swiss police and military personnel (more than fifty individuals) within a day of the Swiss extradition order. Furthermore, the Government likely believing that Mr. Klyushin has a treasure-trove of information related to its investigations surrounding the 2016 election hacks and other matters of interest – a belief shared by the media and others –[9] will no doubt dedicate substantial resources, on its own initiative, to ensuring that Mr. Klyushin complies with his conditions of pretrial release.[10]

Many courts have not hesitated to reject the Government's base contention here – that having ties to, and money in, another country automatically makes a defendant such a serious flight risk that he or she must be detained pretrial. See, e.g., *United States v. Marinez-Patino*, 2011 WL 902466, *6 (N.D. Ill. March 14, 2011) ("it is the risk that a defendant will flee, and not

---

[9] *See https://www.bloomberg.com/news/articles/2022-01-03/kremlin-insider-klyushin-is-said-to-have-2016-hack-details* (U.S. Catches Kremlin Insider Who May Have Secrets of 2016 Hack); *https://edition.cnn.com/2022/01/03/politics/vladislav-klyushin-kremlin-ties-federal-court/index.html* ("Christopher Krebs, former head of the US Cybersecurity and Infrastructure Security Agency, called Klyushin's arrest and prosecution a potential 'gold mine' for US intelligence because it could shed additional light on GRU operations against the US and its allies. 'This is a big get for a few reasons: If he flips, he may be able to confirm the intelligence community's findings about Russian efforts to interfere in the 2016 election,' Krebs told CNN."); Email received by Mr. Klyushin's wife, attached hereto as Exhibit 11 ("Tell him if he chooses the correct side, he will be out in about a week…. [t]he only thing your husband would need is to admit his participation in the elections meddling in Trump's favor.").

[10] Indeed, the Government seems to have dedicated more resources to pursuing Mr. Klyushin that his alleged co-conspirators Irzak and Sladkov, who, upon information and belief, have travelled internationally following Mr. Klyushin's arrest and whose trading accounts, upon information and belief, have not been seized.

just his immigration status, that a court must consider under Section 3142(d)").

In *United States v. Karni*, 298 F. Supp. 2d 129 (D.D.C. 2004), defendant was alleged to have violated the Export Administration Act and IEEPA by acquiring nuclear triggers and exporting them to Pakistan. Defendant was an Israeli national who had resided in South Africa for the eighteen years preceding his arrest and had "no ties to the United States or the Washington, D.C. area" of any kind. Indeed, he "was only in this country in order to participate in a ski vacation with his wife and daughter." Although "the weight of the evidence against Defendant is substantial," the Court found that none of the foregoing justified pretrial detention under the Bail Reform Act. The same conclusion is called for here.

In *United States v. Hansen*, 108 F. App'x 331 (6th Cir. 2004), the Sixth Circuit Court of Appeals affirmed the district court's order of pretrial release, even though the defendant, charged with bulk cash smuggling and forfeiture, was a resident and citizen of Denmark, a non-extradition country. The Court of Appeals noted that the "bail statute does not ... require that foreign defendants be detained simply because their return cannot be guaranteed through extradition."

In *United States v. David Sidoo*, 19-cr-10080-NMG, Dkt. 13 (D. Mass), the district court ordered the release of defendant, a citizen of Canada charged with conspiracy to commit wire fraud, honest services fraud, and money laundering. The defendant, who had no status in the United States, was permitted to reside in his home in Canada during the pendency of his United States criminal case.

In *United States v. Bodmer*, No. 03 CR 947 (SAS), 2004 WL 169790, at *1 (S.D.N.Y. Jan. 28, 2004), the defendant a, "Swiss national who was arrested while in South Korea on business", and who was charged with conspiring to violate the Foreign Corrupt Practices Act and

the Money Laundering Control Act, was released on a $1 million bond when his assets totaled $2.4 million. The Government argued that the defendant had "a strong incentive to flee because pursuant to Swiss law, the Swiss government will not extradite Swiss nationals" and that the "Swiss government will not recognize [defendant's] written waiver of his right to avoid extradition." *Id.* at *2. The Government also argued that the defendant's assets were substantially more than he reported, in part, because he was a "Swiss attorney who specializes in offshore accounts and complicated financial transactions [who] likely ha[d] offshore accounts himself." *Id.* The court rejected both Government arguments stating that the issue of unreported assets was based on "mere speculation" and that being a citizen of a non-extraditable country "alone cannot be a basis for denying bail because if taken to its logical conclusion, no Swiss national would ever be eligible for bail." *Id.* Additional consideration for granting bail in *Bodmer* that is equally applicable here is the fact that the defendant in *Bodmer* was facing serious criminal charges, discovery was expected to be voluminous, and that pretrial release made it "far easier for [defendant] to assist his counsel in reviewing and responding to discovery if counsel has regular, uninterrupted access to him." *Id.* at *3.

As an additional example, in *United States v. Khashoggi*, 717 F. Supp. 1048, 1050-52 (S.D.N.Y. 1989), the court released on bail an "enormously wealthy" Saudi Arabian defendant with limited ties to the United States who was facing trial on mail fraud charges and who "remained abroad as a fugitive for six months" until his arrest and extradition from Switzerland, even though there was no extradition treaty in place with Saudi Arabia. *Id.* 717 F. Supp. at 1049; *see also Hung v. United States*, 439 U.S. 1326, 1329 (1978) (Brennan, J.) (reversing a post-conviction detention order of a Vietnamese national with limited ties to United States even

though "should applicant flee to Vietnam, the United States would have no means to procure his return...").

As these cases demonstrate, that Mr. Klyushin lives outside the United States does not *ipso facto* create a serious risk of flight or justify his pretrial detention, particularly given all the other facts discussed above supporting his future appearances in court upon release.

Finally, that the defendant presents a risk of flight does not end the statutory inquiry. As one court has properly explained:

> the proper focus is not how big [the threat of flight] would be if the defendant were released on no conditions, but, instead, the focus should be on how big [the threat of flight] would be if the defendant were released on stringent conditions. In other words, the issue is not how much [flight risk] the defendant would pose if he were as free as any law-abiding citizen, but on how much threat he would be if he were released on the most stringent conditions.

*United States v. Aileman*, 165 F.R.D. 571, 580 (N.D. Cal. 1996). The Bail Reform Act, properly applied, imposes on district courts the obligation to fashion release conditions, however stringent, which will reasonably assure the appearance of the defendant. The risk that Mr. Klyushin would flee (or be successful at fleeing), with all the available conditions to this Honorable Court, would be virtually non-existent.

## II.     PRETRIAL RELEASE IS NECESSARY TO SECURE THE PRIVILEGE AFFORDED BY THE SIXTH AMENDMENT.

Pretrial release is also critical to counsel's ability to provide effective assistance of counsel, as well as the defendant's ability to meaningfully contribute to his defense. The Sixth Amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' and who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses

in his favor'" *Faretta v. California,* 422 U.S. 806, 819 (1975).

The assistance of counsel during the period of pretrial preparation is indispensable to a defendant's ability to obtain a fair trial, as the Supreme Court of the United States has recognized: "the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel during the period prior to trial may be more damaging than denial of counsel during the trial itself." *Maine v. Moulton*, 474 U.S. 159, 170 (1985). Indispensable too is the defendant's own ability to review discovery and participate in the preparation of his case for trial. Indeed, Mr. Klyushin is a trained criminal lawyer who seeks to maximize his participation in preparing his defense. Yet pretrial detention automatically condemns defendants like Mr. Klyushin not just to loss of liberty but also, under circumstances such as those present here and in other complex federal criminal prosecutions, to sharp curtailment of his ability to participate meaningfully in the preparation of his defense and the concomitant magnification of the disadvantages he faces in confronting serious and complex charges which the Government has spent years investigating and amassing the evidence which it contends supports them.

Indeed, in this case, the Government produced over five (5) terabytes (or 5,000 gigabytes) of discovery that contains in excess of 1 million individual files. Assuming *arguendo* someone spends forty hours per week, reviewing each file for just one minute, it would take more than eight years to review the current discovery production. As for Mr. Klyushin, who receives access to the discovery database for only sixteen hours per week, his cursory review of the discovery materials would take more than twenty years.  Magnifying the difficulty of reviewing such a voluminous production is that the current discovery database is not searchable, none of the documents are bate stamped, and some of the data has not been converted to a format that would be accessible to the defense. Indeed, despite getting an initial production on February

8, 2022 – nearly two months ago – the defense still does not have an index, which is required by L.R. 116.10. The Government represented that it will produce an index, its "hot doc" list, and a searchable load-ready database ready to be hosted on a discovery platform; however the defense has no current estimated completion date. Mr. Klyushin was arrested more than a year ago and despite expecting his extradition to the United States, the FBI made no efforts to make the extensive production searchable or usable in a way that would expedite the preparation of Mr. Klyushin's defense.

The fact that the defense does not have an index or a production in searchable format is only part of the problem. The initial production was missing relevant log files that the Government has subsequently supplemented. The defense is without knowledge on what additional, relevant materials may have been omitted or irrelevant materials that may have been included. Indeed, some materials within the production reference individuals and phone records that do not seem to be related to his case. Instead, the materials appear to be more related to cases being prosecuted in this district, *i.e.*, *United States v. Bortnovsky*, Dkt. 22-cr-10006-WGY (D. Mass) (an unrelated insider trading case), or other potential cases involving Russian businessmen with potential ties to the former Trump administration.

Additionally, much of the discovery consists of iCloud data from various accounts, multiple virtual machine images, and other technical information obtained from the forty-three search warrants in this case that require extensive forensic expertise and software to open and review.[11]  The defense, for example, has not yet been able to access connections logs for WhatsApp data, which the Government has agreed to reformat but has not yet produced. The

---

[11] A virtual machine (VM) is the virtualization/emulation of a computer system. Virtual machines are based on computer architectures and provide functionality of a physical computer. *See https://en.wikipedia.org/wiki/Virtual_machine.*

case includes nine iCloud backup files that have not been processed into a reader format.  While

the Government has provided an additional three iCloud accounts in a more user-friendly

Cellebrite report, the accuracy of the reports remains unclear. In fact, the report for Mr.

Klyushin's phone features an image of Magistrate Judge Bowler's photo-copied signature as a

photograph in the production from Mr. Klyushin's iCloud account:



The defense believes the photocopied signature emanates from one of the search warrants

and affidavits that were stamped by Magistrate Judge Bowler's digital signature, *see* Exhibit 12

Digital signatures of Special Agent Kang, *see id.*, were similarly copied onto the affidavits that

were submitted in support of search warrants issued pursuant to Fed. R. Crim. P. 4.1. The

defense has requested the original search warrants and search warrant returns to explore potential

suppression issues, which it has not yet received. Finally, at least preliminarily the defense

believes that some productions files in response to Grand Jury subpoena may have been edited

after their receipt based on hash values – an issue that the defense is still investigating. *See*

Exhibit 13.

Compounding the difficulty of preparing the defense is the fact that much of the

discovery is in English, which Mr. Klyushin does not understand well, and the other portion of the discovery is in Russian which needs to be translated into English. Mr. Klyushin's detention facility has not allowed the undersigned to provide the facility with a laptop for Mr. Klyushin's use that contains translation software, a Russian keyboard, and other software necessary to aid his review. Instead, the facility had agreed to provide one of its own computers and to load it with translation software, however, that setup has not yet been finalized. Even if Mr. Klyushin obtains a computer with translation software from the facility, it is still unlikely that he will be able to review the vast portions of discovery requiring forensic software or the searchable version of the productions (once they are prepared by the Government and processed by the defense) given that major discovery review platforms, *e.g.,* Relativity and Concordance, require online access.

The effect of the Government not providing searchable data has in fact necessitated unnecessary prolongation of the pretrial phase and should be a consideration for purposes of bail as well as the implications to Mr. Klyushin's Sixth Amendment rights.  Only the prosecution can inform the Court when the searchable data will be available. However, even when the searchable database is available it will take a substantial amount of time to review and will take Mr. Klyushin a far greater time if he is detained with time-limited access to discovery and no access to the internet.  It is the obligation of the defense to review all the materials and to prepare a defense to these charges. Mr. Klyushin has an equal right to review evidence and assist in the preparation of his defense, which under the current circumstance of pretrial detention is impossible.

Such considerations are surely factors which must be considered in determining whether prolonged pretrial detention violates the defendant's Sixth Amendment right and whether there

are conditions of release which will reasonably assure the defendant's appearance and allow him

and his counsel to prepare for trial.

## COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

The undersigned counsel has conferred with the Government, who by and through AUSA

Seth Kosta, opposes the request to revoke the pretrial detention order.

Respectfully Submitted,
Vladislav Klyushin,
By His Attorney,

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.
Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
menemtsev@gmail.com

Dated: April 5, 2022

## CERTIFICATE OF SERVICE

I, Maksim Nemtsev, hereby certify that on this date, April 5, 2022, a copy of the
foregoing documents has been served via Electronic Court Filing system on all registered
participants.

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.