UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | CRIMINAL NO. 21-cr-10104-PBS |
| VLADISLAV KLYUSHIN<br>        Defendant | ) ) ) ) | |

**RESPONSE TO MEMORANDUM OF THE UNITED STATES OPPOSING APPEAL OF MAGISTRATE JUDGE'S PRETRIAL DETENTION ORDER**

The sole issue before this Honorable Court on this *de novo* review is a narrow one: has the Government proved, by a preponderance of the evidence, that Mr. Klyushin poses a serious flight risk, *and* that no conditions exist other than detention that will reasonably assure his future appearances in court? The defense respectfully contends that the Government has not met its burden and that Mr. Klyushin's detention order should be revoked so that he may be released to home confinement under the strict conditions that are available to this Honorable Court. The conditions that the defense proposed, Dkt. 48 at 3-4, including any conditions that this Honorable Court may independently fashion, have successfully assured the appearance of other international defendants, wealthy individuals with foreign ties, and even the then-head of a New England Mafia family, *see* Dkt. 48 at 17-22; *United States v. Patriarca,* 948 F.2d 789, 793 (1st Cir. 1991). There is no reason to believe that these same conditions will fail to reasonably assure the appearance of Mr. Klyushin, an individual with no prior involvement with the criminal justice system, no history of violating any court orders, no history of using false identifications or engaging in obstructive conduct, no history of drug or alcohol abuse and, who like Patriarca, exhibits no "propensity to flee." *Patriarca,* 948 F.2d at 793.

1

**I.      THE DETENTION ORDER SHOULD BE REVOKED BECAUSE THERE ARE CONDITIONS SHORT OF PRETRIAL DETENTION THAT CAN REASONABLY ASSURE MR. KLYUSHIN'S FUTURE APPEARANCES IN COURT.**

Mr. Klyushin is presumed innocent and presumed to receive bond, 18 U.S.C. § 3142 (a), (b) and (j). In this case, the Bail Reform Act has declared a *presumption for release.* Accordingly, there is a "strong presumption *against* detention," *United States v. Hanson*, 613 F. Supp. 2d 85, 87 (D.D.C. 2009) (emphasis added), with any "[d]oubts regarding the propriety of release … resolved in favor of the defendant." *United States v. Motamedi*, 767 F.2d 1403, 1405, 1405 (9th Cir. 1985) (Kennedy, J.); *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) ("In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.") (citing *United States v. Salerno*, 481 U.S. 739, 755 (1987)). Importantly, the inquiry of whether Mr. Klyushin poses a serious risk of flight that cannot be reasonably abated with stringent conditions is not based on an assessment if "[Mr. Klyushin] were as free as any law-abiding citizen, but on how much threat he would be if he were released on the most stringent conditions." *United States v. Aileman*, 165 F.R.D. 571, 580 (N.D. Cal. 1996). The Government surmises that if Mr. Klyushin is released even under the strictest conditions, he will take to flight. It is difficult to imagine, however, a cognizable situation not predicated on extraordinary speculation where Mr. Klyushin would be able to successfully engineer and execute flight while, amongst other conditions, being subject to home-confinement, GPS monitoring, and frequent checks by pretrial services. *See United States v. O'Brien*, 895 F.2d 810 (1st Cir. 1990) (Narcotics defendant who posed a serious risk of flight nevertheless overcame presumption against pretrial release where defendant consented to wear electronic monitoring bracelet and offered residence as security). The Bail Reform Act does not require foolproof conditions or that the risk of flight be reduced to zero; all that is required are

reasonable conditions. Any Government demand that the imposed conditions be foolproof is contrary to law:

> It is true, as the Government points out, that electronic monitoring is not foolproof and that it is possible that Mr. Hassanshahi could overcome several significant obstacles to get to Iran. But those general arguments are speculative and do not focus on this defendant. The law only requires release conditions that will *reasonably* ensure a defendant's appearance, not foolproof conditions. An overall balancing of the factors favors Mr. Hassanshahi's release with conditions.

*United States v. Hassanshahi*, 989 F. Supp. 2d 110, 118 (D.D.C. 2013) (emphasis in original).

The list of "innovative and extensive group of conditions" that have been proposed here have reasonably assured the appearance and the safety of the community from the leader of a Mafia family, whose members committed murder and other acts of violence and who was at the time of his arrest the ongoing "boss" of an organization that would commit new offenses. *See United States v. Patriarca*, 948 F.2d 789 (1st Cir. 1991). There is no reason those same conditions will fail to assure Mr. Klyushin's appearance in this case. In affirming Judge Wolf's order of release, the First Circuit found that "that Patriarca would comply because compliance was in his enlightened self-interest." Mr. Klyushin is similarly self-interested to obey this Honorable Court's conditions of release. His history shows no propensity to flee nor violation of any court order directed to him. A violation of his proposed conditions would be dire. Not only would he expect to receive a significant increase in any potential sentence, but he would also lose substantial assets, be an international fugitive if he fled, and would end up living the remainder of his life in fear of apprehension.

The Government seems to concede that Mr. Klyushin's Russian citizenship is not sufficient as the sole basis for detention, Dkt. 52 at 11;[1] instead, it focuses on what it claims are "significant ties to its leadership and its military intelligence community." *Id.* As an initial matter, Mr. Klyushin is not an employee or agent of the Russian Federation. He is the owner of a company, M-13, that counts agencies of the Russian Federation as one of its many clients. That he received public, framed awards and recognition for his company's work is not indication that he has access to any resources that could help facilitate flight from the United States.[2] Indeed, even the alleged conversation between Mr. Klyushin and co-defendant Ermakov, if accurate, clearly indicates that any potential name change would not be sufficient for travel in the United States. Importantly, there is no evidence that Mr. Klyushin ever requested, received, or used any false travel documents or that he has any specialized knowledge that would allow him to avoid surveillance or escape.

Similarly, the defense continues to dispute the Government's contentions that Mr. Klyushin was ever aware of or participated in the alleged hacking and insider trading scheme. The Government places significant weight on a June 30, 2020 text messages exchange – made

---

[1] Having never lived in this country, Mr. Klyushin, of course, lacks family and employment ties to the United States. That, however, is no bar to pretrial release. Moreover, Mr. Klyushin fully expects that if he is released on bail, his wife and children will come to the United States and support him while he defends against these charges.

[2] The consulate letter that the defense submitted to Magistrate Judge Bowler from the embassy assuring the court that the Russian Federation will not issue any travel documents to Mr. Klyushin and that it will not interfere with the criminal proceedings is not indicative of any employee or agency relationship. The consulate of Saudi Arabia submitted a similar letter for one of its citizens in *United States v. Khashoggi*, 717 F. Supp. 1048, 1052 (S.D.N.Y. 1989), which was one of the basis for granting bail. ("the Royal Consulate General of Saudi Arabia has guaranteed this Court that the defendant's homeland will insure the defendant's appearance at trial….")

during the COVID-19 lockdown – between Mr. Klyushin and his co-defendant Ermakov where they discuss earning money by "turn[ing] on a computer," the discussions about trading profits on behalf of investors seven months later, and the messages to investors requesting that they monitor the price of Tesla shares before and after an earnings announcement. This, however, is hardly substantial evidence of the alleged crimes or the concrete, direct, inconvertible proof the Government argues warrant the weighing of the 18 U.S.C. § 3142 factors in its favor. It makes perfect sense that making money during the pandemic for a vast portion of the population involved "turn[ing] on a computer" and it certainly makes sense that Mr. Klyushin monitors his investors' performance. Additionally, the Government cites to conversations between co-defendant Rumiantcev and Ermakov that it labels as "elaborate subterfuge to conceal the illicit source of the material non-public information." Dkt. 52 at 10.  What makes little sense from the conversation is why Rumiantcev and Ermakov would ever consider disclosing information to third parties if it was, indeed, illegally obtained material non-public information.  It simply defies logic to obtain non-public information and then go through an "elaborate subterfuge" in order to disclose it to a third party. Moreover, Mr. Klyushin does not appear to be part of the conversation. The Government cites to an additional conversation between the defendants where Mr. Klyushin is allegedly warned about "exposing [the] organization" Dkt. 52 at 11. The message comes after Mr. Klyushin sends pictures of his investors. It is simply unclear how pictures of investors could "expose" anything or how they prove the underlying allegations here: that Mr. Klyushin participated in hacking and trading on material non-public information. Despite the review of thousands of conversations, the Government citation to these specific instances just highlights the utter lack of evidence that Mr. Klyushin ever hacked the filing

agents, on his own or through instructions to others, or that he obtained, reviewed, or traded on any material non-public information.

Finally, Mr. Klyushin accurately and fully disclosed his assets to pretrial services including the assets that the Government seized in his securities accounts.[3] The Government has full access to his brokerage statements and can track his transactions and monetary transfers. Instead, it relies on the $82.5 million-dollar profit figure proffered by the SEC, even though the evidence is indisputable that Mr. Klyushin made far less from his trading activities.[4] Even if the Government could prove Mr. Klyushin had millions hidden, access to funds is not an adequate reason to deny bail, or to hold that no release conditions will suffice. *See, e.g., United States v. Seng*, 15-cr-706-VSB, Dkt. (S.D.N.Y.)  (granting bail despite "seemingly endless wealth" and no ties to the U.S.); *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007) (ordering release despite defendants possessing "ample means to finance flight," and finding that they "could, with relatively little disruption, continue to operate their highly lucrative business from any number of overseas locations"). Far more than wealth is needed for the Government to meet its burden of proof but is not present here.

In *United States v. Anderson*, 384 F. Supp. 2d 32 (D.D.C. 2005), a case that the Government relies on, the defendant was not detained because he had vast wealth and substantial

---

[3] The defense similarly believes that U.S.-based audit firms could conduct any financial audit ordered by this Honorable Court. Reports indicate that the Russian arms of the U.S.-based accounting firms continue to operate as "independent accounting firms" and that they continue to support operations in Russia. *See* https://news.bloomberglaw.com/financial-accounting/why-the-big-fours-russia-pullout-isnt-a-clean-break-explained ("A spokesman for KPMG LLP said in a call Wednesday that it was confident it could continue to service multinationals with operations in Russia.").

[4] Even in an affidavit submitted in the Cyprus litigation concerning the seizure of assets, the Government proffered a profit figure of less than $12 million, which the defense believes continues to overinflate the income Mr. Klyushin made from trading.

assets abroad, but because he had previously used aliases and false identities when traveling abroad, and there was strong, specific evidence of his clear interest in fleeing the jurisdiction and his intent and preparation to do so, including numerous books and pamphlets seized from him describing means of creating and obtaining false identification. *Id.* at 36. As opposed to the facts and evidence in *Anderson* showing Anderson's various existing preparations to flee, all the Government offers here is their professed concern that, if released, Mr. Klyushin may choose to flee. This asserted concern – which arguably applies to every defendant seeking bail – falls far short of the Government's burden of proving that the proposed restrictions that would govern Mr. Klyushin's release are unreasonable and unworkable because of some specific reason particular to him. *Cf. United States v. Tajideen*, 2018 WL 1342475 (D.D.C. Mar. 15, 2018) (extremely wealthy 62-year-old defendant with vast overseas holdings and citizenship in Belgium, Lebanon, and Sierra Leone posed serious risk of flight because he also had a prior forgery conviction); *United States v. Morrison*, 2016 WL 7421924 (W.D.N.Y. Dec. 223, 2016) (defendants posed flight risk because they were drug mules whose crime required having the skills, knowledge, and ability to move surreptitiously across the Canada-U.S. border carrying drugs). There is simply no evidence that Mr. Klyushin possesses the skills and experience necessary to break home confinement, evade government monitoring of his ankle bracelet, and successfully leave the country with a fake passport and an assumed identity. Unlike the defendants in *Anderson, Tajideen,* and *Morrison*, there is absolutely nothing in Mr. Klyushin's history or attributes that support any of this happening.

      These same biased assumptions on gain and loss (including the "substantial damage the defendant and his co-conspirators caused the Filing Agent victims," Dkt. 52 at 12) improperly inflate the gravity of the claimed offenses, and with it the purely advisory sentencing guidelines

range. There is no reason for Mr. Klyushin to believe that he faces a long and substantial sentence if he is convicted. Indeed, just recently the Western District of Washington sentenced a high-level hacker to five years imprisonment, for a more damaging scheme, which involved the theft of more than 20 million customer card records from over 6,500 individual point-of-sale terminals at more than 3,600 separate business locations, and which caused losses in excess of $1 billion dollars. *See United States v. Iarmak*, Dkt. 19-cr-00257-RSM, Dkt. 60 (W.D. Wash.).

## II.  PRETRIAL RELEASE IS NECESSARY TO SECURE THE PRIVILEGE AFFORDED BY THE SIXTH AMENDMENT.

The sixteen hours per week that Mr. Klyushin can access a computer at his detention facility and the two hours per day that he can speak with his counsel is not "extraordinary access to counsel and discovery," Dkt. 59 at 13.[5] Nor is it sufficient for the defendant to navigate and review the extensive discovery necessary to prepare his defense. Just to illustrate the complexity and the immense size of the initial production: it took the Government more than two months to create a simple index despite the resources of the United States Attorney's Office, the SEC, the FBI, and its familiarity with the materials after investigating this case for more than three years. The current access to counsel and to the discovery materials are simply insufficient to guard Mr. Klyushin's Sixth Amendment right to meaningfully contribute to his defense and, equally important, his right to a speedy trial. Mr. Klyushin has been incarcerated for more than a year and wants to expedite a jury trial of this matter. The delays in providing Mr. Klyushin with the most basic information and resources, *e.g.,* an index, discovery in a format that is searchable and accessible, or access to translation software (which is still not functional) has already prolonged

---

[5] The Government's schedule, Dkt. 59-2, includes two-time slots on Tuesday and Sunday morning that Mr. Klyushin reports have not been provided to him. *See* Supplemental Exhibit 1.

the pretrial phase and will continue to delay a future trial of this matter.[6] Despite the best efforts of the detention facility, the translation software that was installed on the facility's computer requires internet access and does not currently work and the two-hour sessions allocated to Mr. Klyushin are often insufficient to de-archive (let alone review) some of the materials within the discovery production.[7] The defense has been attempting to mitigate these issues by reviewing the discovery with Mr. Klyushin via phone or video chat for the last three months, but these efforts are not a substitute for Mr. Klyushin's own review and assessment of the Government's evidence against him.

  The Government argues that Mr. Klyushin has been "in custody in the United States for only four months," but ignores the fact that Mr. Klyushin – a person who is presumed innocent – has also spent more than eight months confined in Switzerland away from his family under conditions akin to solitary confinement. Pretrial detention will continue to hinder Mr. Klyushin's ability to review the discovery materials diligently and expeditiously and to assist his counsel in preparing for trial. As previously mentioned, incarceration before trial "substantially impacts the quality of the[] defense" and "increase[s] the likelihood that the detainee will be convicted, imprisoned, and subjected to prolonged deprivation of liberty, privacy, and other fundamental elements of human existence." Samuel R. Wiseman, *"Pretrial Detention and the*

---

[6] Mr. Klyushin was only notified on April 24, 2022, that the translation software was installed. Additional software that was necessary to review .eml files (containing emails), .pptx files (containing PowerPoint presentations), and .heic files (containing images) was just uploaded to the computer system.

[7] Consistent with the undersigned's experience with Wyatt Detention Facility, which allows counsel to provide a personal laptop for a defendant's use to review the discovery, the defense offered to provide the Plymouth County Correctional Facility with a laptop for Mr. Klyushin's use that is preinstalled with translation software and software necessary to de-archive and review the discovery. Access to a personal laptop would allow Mr. Klyushin to work on the case for more than two hours per day and allow him to leave the de-archiving software running while the computer is not in use. The detention facility denied the defense's request.

*Right to be Monitored,"* 123 YALE L. J. 1344 (2014).  Such consequences should certainly be considered in determining whether prolonged pretrial detention violates the defendant's Sixth Amendment right and whether there are conditions of release which will reasonably assure the defendant's appearance.

Respectfully Submitted,
Vladislav Klyushin,
By His Attorney,

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.
Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
menemtsev@gmail.com

Dated: May 6, 2022

## CERTIFICATE OF SERVICE

I, Maksim Nemtsev, hereby certify that on this date, May 6, 2022, a copy of the foregoing documents has been served via Electronic Court Filing system on all registered participants.

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.

Supplemental Exhibit 1

Vladislav Klyshin

Unit BN1

#80140

## Discovery Evidence Schedule

| M | T | W | T | F | S | S |
|---|---|---|---|---|---|---|
| 8:30am-10:30am | 7:00pm-10:00pm | 8:30am-10:30am | 8:30am-10:30am | 8:30am-10:30am | 8:30am-10:30am | 1:00pm-4:00pm |

Plymouth County Jail