UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA )
)
                v. )        CRIMINAL NO. 21-cr-10104-PBS
)
VLADISLAV KLYUSHIN )
           Defendant )        REDACTED COPY
_____)         (Leave to file pending)

**DEFENDANT VLADISLAV KLYUSHIN'S MOTION TO SUPPRESS**

In secret proceedings premised on one-sided hearsay accusations by a partisan law enforcement officer engaged in the "competitive enterprise of ferreting out crime"[1] — accusations intrinsically evading adversarial scrutiny — candor and credibility with the tribunal are vital. An FBI agent shirked those duties in the search warrant applications targeting Vladislav Klyushin, withholding a key fact that cast serious doubt on his veracity and reliability — findings that he made misstatements and omissions in another private warrant application he swore in an equally high-profile case — from a supporting affidavit otherwise strikingly thin on probable cause and particularity. As a result of these triple defects — lack of both particularity and probable cause, particularly considering the material and seemingly studied omission— all fruits of the ensuing searches, direct and derivative, must be suppressed upon a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978).

Specifically, the defense seeks a *Franks* hearing and suppression from evidence of any

_____

[1] *Johnson v. United States.*, 333 U.S. 10, 14 (1948).

materials obtained, or any fruits of such evidence, that were unlawfully seized by the government

pursuant to two search warrants, issued on September 29 and October 13, 2020, directed to Apple

Inc. for information associated with the account Redacted       and Redacted

and the search warrant issued on October 13, 2020, to Google LLC for the substantive

communications and other data associated with the account Redacted       .  The September

29, 2020, affidavit is attached hereto as Exhibit 1 (hereinafter "September Affidavit").  The search

and seizure warrant issued on September 29, 2020, directed to Apple Inc. for the account

Redacted        is attached hereto as Exhibit 2.  The October 13, 2020, affidavit is attached

hereto as Exhibit 3 (hereinafter "October Affidavit").  The search and seizure warrant issued on

October 13, 2020, directed to Apple Inc. for the account associated with Apple ID Redacted  is

attached hereto as Exhibit 4, and the warrant issued on October 13, 2020, directed to Google LLC,

for the account Redacted      is attached hereto as Exhibit 5.[2]

## I.    Background and Facts

As part of its "investigation of a suspected insider-trading scheme in which individuals

have been receiving and then transmitting to others [material non-public information] for the

purpose of executing profitable securities transactions, and the suspected computer-network

intrusion of two U.S.-based filing agents," Exhibit 1 at ¶ 8, the government obtained 44 search

warrants. All the search warrants were issued based on the affidavits of FBI Special Agent BJ

Kang. Only three search warrants and two affidavits pertain to Mr. Klyushin's accounts; the

---

[2] Consistent with the defense's request to seal, the defense filed a redacted copy of this Motion on the public docket. An unredacted copy of this Motion will be provided to this Honorable Court and the government.

remaining searches pertain to alleged co-conspirators and numerous uncharged individuals whose trading, according to the SEC and Special Agent Kang, was conducted in parallel with other Russian nationals ahead of quarterly earnings announcements by companies traded publicly in the U.S.  Mr. Klyushin became a target of the government's investigation on September 29, 2020, more than nine months after the issuance of the first search warrant and more than eleven months after Special Agent Kang was granted access to the SEC's investigatory files.

      **a.  September 29, 2020, Search Warrant**

In affidavits submitted to the court, including the September 29, 2020 Affidavit, attached hereto as Exhibit 1, Special Agent Kang consistently touts his reputation and experience investigating federal wire fraud and insider trading charges. He outlines his prior experience investigating computer intrusions, his training in cyber-crime investigation techniques, and his previous experience as the Supervisory Special Agent of the FBI Cyber Division. Exhibit 1 at ¶ 1.  He similarly states that he has been a Special Agent since 2005 and that he participated in "numerous investigations of fraud relating to the securities markets, including accounting fraud, market manipulation, insider trading and Ponzi schemes." *Id.* Nowhere in the affidavit does Special Agent Kang disclose any prior misstatements and omissions in connection with other investigations or *ex parte* proceedings that would negatively impact his credibility, *see infra* at 11.

In the September Affidavit, Special Agent Kang avers that he is investigating Mikhail Irzak, Igor Sladkov, Ivan Yermakov, Vladislav Klyushin, and five other uncharged individuals in

3

connection with insider trading and computer intrusion. Exhibit 1 at ¶ 3.[3]   The September

Affidavit was submitted in support of applications to search a Yahoo email account belonging to

Mikhail Irzak and the iCloud account associated with the e-mail address ███████████,

which Special Agent Kang alleges is associated with a telephone number belonging to Mr.

Klyushin  *Id.* at ¶ 39.

Despite the affidavit spanning 23 pages and 71 paragraphs, only 6 paragraphs relate to

Mr. Klyushin or his trading accounts, *see id.* at ¶¶ 35-40.  Indeed, the remaining allegations

detail trading and transactions by Irzak and others, but none of these analyses (many of which

were prepared by FINRA, the SEC and Interactive Broker LLC) relate to Mr. Klyushin. For

example, Special Agent Kang states that the "the FBI learned that the SEC had identified a group

of traders based outside the United States who suspiciously traded ahead of quarterly earnings

announcements of several U.S. publicly traded companies,. … . Among the trading accounts

identified by the SEC were accounts in the names of IRZAK, ███████, ███████, and

other traders who engaged in parallel trading ahead of quarterly earnings announcements of

various U.S. publicly traded companies, including the companies identified above." *Id.* at ¶ 12.

Special Agent Kang does not allege that Mr. Klyushin's accounts were among those flagged or

that otherwise participated in purportedly "suspicious trading." *Id.*  The remaining paragraphs

similarly detail trading by others (unrelated to Mr. Klyushin) that were flagged or examined by

brokers and financial regulators:

- According to the SEC, ███████—whom I know based on review of Apple records

[3] None of these five individuals have been charged or named as unindicted co-conspirators.
None of the other alleged co-conspirators were arrested or had their financial accounts seized.

obtained pursuant to a Court authorized search warrant is friendly with IRZAK—traded in parallel in at least 11 stocks traded by IRZAK. *Id.* at ¶ 13.

- On or about September 26, 2019, Interactive Brokers LLC, ("IB"), an online brokerage firm that provides electronic trade execution and clearing services, flagged ████████'s IB account (the '████████ IB Account') for having traded ahead of Ulta Beauty, Inc.'s ("ULTA") second quarter 2019 earnings results… Based on information provided by the SEC, I learned that IRZAK also profitably traded ahead of ULTA's second quarter 2019 earnings results. *Id.* at ¶ 14.

- On or about December 13, 2019, IB flagged the ████████ IB Account and IRZAK's IB account (the "IRZAK IB Account") for profitably trading ahead of earnings results of a number of U.S. publicly traded companies. *Id.* at ¶ 17.

- According to IB and the SEC, the IRZAK IB Account engaged in similar trading activity. The IRZAK IB Account traded ahead of quarterly earnings announcements of approximately 149 companies with a 66 percent success rate that netted the IRZAK IB Account approximately $2.6 million in profits. According to IB, the IRZAK IB Account traded in 49 of the 55 stocks traded by the ████████ IB Account. *Id.* at ¶ 19.

- On or about January 16, 2020, FINRA referred an insider-trading matter to the SEC involving parallel trading by IRZAK and other traders based outside of the U.S. (the "Jan. 2020 FINRA Referral"). Based on information produced by FINRA, I am aware that between October 16, 2019, and November 7, 2019, a client account at Otkritie Broker, Ltd., a Cyprusbased brokerage firm (headquartered in Moscow, Russia) also timely and profitably traded either one day before or several hours before at least 21 quarterly earnings announcements (the "OTK Client Account"). Based on my review of the trading activity for the OTK Client Account, I learned that IRZAK traded in parallel with the OTK Client Account in International Business Machines Corp ("IBM"), Snap, Inc., Six Flags Entertainment Corp., Skechers, USA, Inc., Manhattan Associates, Inc., Grubhub, Inc., and others. *Id.* at ¶ 21.

In short, no analysis detailed any parallel trading by Mr. Klyushin or in any of his trading accounts.

The sole six paragraphs relating to Mr. Klyushin, *see* Exhibit 1 at ¶¶ 35-40, are devoid of any specific allegation providing probable cause to issue what distilled to an overbroad search warrant that allowed the government to seize and then search an iCloud account revealing the

most intimate details of Mr. Klyushin's life.[4]

Paragraph 35 of the September Affidavit alleges that on January 21, 2020, after FA-1 conducted a company-wide password reset, "another employee's login credentials were used to gained unauthorized access into FA 1's network environment to view records—such as earnings releases—concerning publicly traded companies, including IBM and Avnet, among others."[5] There is no allegation that Mr. Klyushin or any other individual named in the affidavit was responsible for this alleged intrusion.[6] Paragraph 36 details Special Agent Kang's review of Ermakov's Apple Account, which he alleges had evidence of a Saxo Bank trading application, SaxoTraderGO, installed on his device and contained a "file that appears to be an image dated January 23, 2020, of contracts for difference ("CFDs") trading in Avnet in Saxo trading account 33[redacted]INET." *Id.* at 36. In Paragraph 37, Special Agent Kang states that Avnet "reported its second quarter 2020 financial results [and that] [a]ccording to the SEC, IRZAK and other overseas traders sold short Avnet shares on January 23, 2020 before the close of the market." *Id.*

---

[4] iCloud accounts frequently hold pictures, messages, and other personal information, including potentially full iPhone backups (sometimes multiple iPhone backups) that contain every detail of an individual's life, *e.g.*, their locations, contacts, travel, messages, emails, pictures and videos of their children, and anything else that could be stored on an Apple device.

[5] In addition to Avnet and IBM, Paragraph 26, which relates to the same factual allegations as Paragraph 35, states that earnings releases of at least an additional six companies were accessed that same day: Atlantic Union Bankshares Corp; Hilltop Holdings Inc.; Amphenol Corp; RLI Corp; Steel Dynamics, Inc.; and National Bank Holdings Corp. Special Agent Kang provides no evidence that Mr. Klyushin traded in any stock (other than Avnet) whose earnings reports were accessed that day.

[6] While Special Agent Kang had access to the IP addresses that accessed FA-1 and FA-2, including three overlapping addresses, he provides no evidence that any IP address is linked to Mr. Klyushin or any other individual named in the affidavit. *See* Exhibit 1 at ¶ 22.

at ¶ 37.  The affidavit is silent on whether those transactions were truly parallel, *i.e.* whether the transactions by "IRZAK and other overseas traders" were in CFDs or whether the CFDs purchased by the Klyushin SaxoTrader account were in the same direction as the transactions by Irzak. The affidavit also omits that the Avnet earnings release caused the stock price of Avnet to increase on the next trading day, January 24, 2020, which would have made the "IRZAK and other overseas traders['" short sell position unprofitable, *see* Avnet Share Prices, attached hereto as Exhibit 6.  Regardless, without any additional information or a true comparison to show the parallel nature of these transactions, Special Agent Kang concludes solely based on this one transaction that Mr. Klyushin's Saxo Trading Account "***is believed*** to have traded in parallel with IRZAK in multiple publicly traded companies generally within hours of earnings announcements…" *Id.* at ¶ 38. This belief, which was indispensable to probable cause, is unfounded and unsupported by any other evidence in the affidavit. That Mr. Klyushin traded in CFDs in the Avnet stock when "IRZAK and other overseas traders" shorted the same stock on January 23, 2020, is not a basis for the broader conclusion that these accounts traded in parallel – let alone with respect to "*multiple* publicly trading companies."[7]  Special Agent Kang failed to perform any wider analysis, despite having access to the SEC's investigatory files.[8] Indeed,

---

[7] As evidenced by the Avnet stock chart, over 1.4 million shares of the stock were traded on the date of the announcement and the following day.  It is likely that thousands of traders made the same transaction on January 23, 2020.

[8] Letters between the SEC and DOJ indicate that Special Agent Kang obtained access to the SEC's investigatory files as early as November 2019. Based on discovery received to date, Special Agent Kang started his investigation and issuance of grand jury subpoenas as early as September 2019.

Special Agent Kang does not allege that Mr. Klyushin's account closed the transaction on the same days that "IRZAK and other overseas traders" closed their transactions. Nor does he allege that Mr. Klyushin traded in IBM, a company that he knew Irzak allegedly traded after the January 21, 2020, intrusion into FA-1, *d.* at 27, or in any of the hundreds of other companies serviced by FA-1 and FA-2. *See Id.* at ¶ 9.[9]  The evidence linking Mr. Klyushin's account to the transactions of others is "belief" – thin code for raw guess or hunch – which in turn rests crucially on the agent's commitment to making truthful disclosures and representations.

The remaining paragraphs similarly lack any allegations linking Mr. Klyushin to the alleged hack or any alleged insider scheme and most importantly his iCloud account to any such illegal activities. They allege that the Saxo Trading Account located on the Ermakov Apple Account was registered in Mr. Klyushin's name, that Mr. Ermakov and Mr. Klyushin exchanged multiple, unspecified "WhatsApp messages, images, and documents," and that on March 27, 2019 Ermakov made an entry into his calendar "Meeting with Vlad on the stock exchange,"[10] which Special Agent Kang concludes "may be a reference" a meeting with Mr. Klyushin, and a May 12, 2019 calendar entry that states "BCS Seminar," which does not appear in any way to relate to Mr. Klyushin.  There is utter lack of any other allegations linking Mr. Klyushin (or Mr. Ermakov) to any of the other individuals named in the affidavit, *i.e.,* despite having obtained court ordered PRTT data for Mr. Klyushin, Mr. Ermakov, and Mr. Irzak, there is no allegation

---

[9] Filing Agents 1 and 2, in fact, service most publicly traded companies in the United States. *See https://www.barrons.com/articles/how-hackers-allegedly-got-an-early-look-at-earnings-51643667592*
[10] The correct translation of the messages is "Meeting with Vlad about the stock exchange."

that Mr. Klyushin or Mr. Ermakov communicated with Irzak or any other traders about any company, earnings report, or transaction.

On this thin basis for probable cause, Special Agent Kang sought and obtained a search warrant authorizing unfettered access to Mr. Klyushin's iCloud account to search for categories of evidence that would have allowed him to seize every single document in Apple's possession – a classic fishing expedition. *See* Exhibit 2. The search resulted in the government's discovery of an additional Apple DS ID that was the subject of an October 13, 2020 search warrant, which ulitmately led to the wholesale seizure of Mr. Klyushin's iCloud account.

### b. October 13, 2020, Search Warrants

Following the execution of the September 29, 2020 warrant and learning that the Redacted Apple Account was associated with a specific Apple DS ID, Special Agent Kang applied for two search warrants, which were supported by an October 13, 2020 affidavit that did not incorporate any of the prior affidavits. The October Affidavit was submitted in support of two warrants: (1) to search and seize the iCloud data associated Apple ID Redacted, attached hereto as Exhibit 4; and (2) to search and seize Google's records, including substantive emails, associated with the account Redacted, attached hereto as Exhibit 5. The October Affidavit is nearly identical to the prior September Affidavit. It includes no new trade analyses that link Mr. Klyushin's accounts to any insider trading scheme; it includes no new information linking Mr. Klyushin to any alleged computer intrusion. The section relating to Mr. Klyushin has minor, but important, differences.  Specifically, Special Agent Kang – implicitly recognizing that no evidence supported his initial surmise – dropped the key allegation that Mr. Klyushin's Saxo Trading Account "***is***

9

**believed** to have traded in parallel with IRZAK in multiple publicly traded companies generally within hours of earnings announcements…" *Compare* Exhibit 1 ¶ 38, *with* Exhibit 3 ¶ 23. What remains is only an allegation that Mr. Klyushin's account traded CFDs in Avnet on January 23, 2020, and that Irzak and other overseas traders shorted shares of Avnet that same day. Additionally, the October Affidavit removed the allegation that Ermakov had access to the account to execute "profitable" trading. *Compare* Exhibit 1 ¶ 36, *with* Exhibit 3 ¶ 21.  The only substantive additions were footnote 8 alleging that Mr. Klyushin made a $1 million transfer to his Saxo Bank account on October 29, 2019, made an additional transfer of $3.3 million between July 2019 and April 2020 to an OTK brokerage account for "PARTICIPATION IN TRADING," *id.* at ¶ 23, n. 8, and that Mr. Klyushin's Google Account received six unspecified emails from broker@vtb.ru, which led Special Agent Kang to "believe that KLIUSHIN may have another brokerage account with VTB to place trades." *Id.* at ¶ 29.  There was no allegation that any VTB accounts were used in connection with any parallel or illegal trading. Nor were there no new allegations linking the iCloud or Google accounts to any alleged criminal activity. To the contrary, dropping the supposition that Mr. Klyushin's account "traded in parallel with IRZAK" undermined any conceivable reason to believe that Mr. Klyushin was involved in the scheme.  It is thus apparent that evidence tying Mr. Klyushin to any purported hacking or insider trading scheme was virtually non-existent. Stripped of the allegation earlier premised entirely on Special Agent Kang's "belief," the requests to search all of Mr. Klyushin's iCloud and Google data solely because of a transaction in a single stock and six unspecified emails from a broker not

implicated in any parallel trading are even more unreasonable and unsupported.[11]

### c. Prior Misstatements and Omissions in Connection With *Ex Parte* Proceedings.

Prior to being involved in this case, Special Agent Kang, who is known for his investigations of high-profile securities fraud matters, *see https://en.wikipedia.org/wiki/BJ_Kang,* was found to have made misrepresentations and omissions in a separate high-profile insider trading case. This important fact was never disclosed to the magistrate judge despite probable cause resting almost exclusively on Agent Kang's "beliefs" and conclusions, which were unsupported by analytics or other evidence.

In *United States v. Rajaratnam*, Special Agent Kang applied for Title III warrants based on his 53-page affidavit that left out key details concerning a cooperating source, the progress of the SEC's investigation, and paraphrased recorded calls in way that "evince a lack of frankness." *United States v. Rajaratnam*, 2010 WL 4867402, at *11 (S.D.N.Y. Nov. 24, 2010). Judge Holwell of the Southern District of New York granted a *Franks* hearing based on omissions concerning "the existence of a lengthy SEC investigation that preceded the wiretap request,"

---

[11] The relevant search warrant returns were submitted to the court on April 28, 2021, more than six months after their execution, which is inconsistent with Fed. R. Crim. P. 41(f)(1)(D)'s requirement that the warrant be "promptly return[ed] … to the magistrate judge designated on the warrant." While the defense is not in possession of certifications by Special Agent Kang for two of the relevant search warrants, the sole relevant return in the defense's possession indicates that he executed the warrant on October 14, 2020 and signed the certification on April 20, 2021. Though the defense cannot demonstrate that "non-compliance with the rule was intentional or in bad faith," *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B 1981), it does demonstrate at least negligence in flouting the strict requirements of the Federal Rules of Criminal Procedure.

which was relevant to the "necessity" prong of the Title III analysis, finding that "these omissions … are serious enough to constitute a substantial preliminary showing that the government acted knowingly or recklessly." *United States v. Rajaratnam*, 2010 WL 3219333, at *2 (S.D.N.Y. Aug. 12, 2010).  Ultimately, Judge Holwell "determined that information regarding the SEC investigation was omitted with 'reckless disregard for the truth,' [but] concluded that suppression was not warranted because [the defendant] had failed to show that the omission was 'material' to the Court's determination of 'necessity.'" *United States v. Rajaratnam*, 719 F.3d 139, 150 (2d Cir. 2013). While Judge Holwell did not hold a *Franks* hearing on the "probable cause" issue because "[a]dding ... all [the evidence] up, and correcting the affidavit to account for the government's misstatements and omissions … there were enough facts for [the issuing judge] to have found probable cause," *Id.* at 147, he did find "that the criminal authorities [] made a glaring omission" concerning the SEC investigation and that the affidavit contained other "inaccuracies and inadequacies [which gave] the Court pause." *Rajaratnam*, 2010 WL 4867402, at *15. "Particularly disturbing [was] the omission of highly-relevant information regarding [CS]'s prior criminal record for fraud which is 'peculiarly probative of credibility[,]" and other statements which Judge Holwell stated "[did not] win high marks for candor" and "evince[d] a lack of frankness that should be found in all *ex parte* applications."  *Id.* at *10-11.

The Second Circuit ultimately reversed Judge Holwell's finding that the extensive SEC investigation's omission – in turn bearing on the "necessity" prong – occurred with "reckless disregard for the truth," concluding there was a lack of intent to deceive based on testimony from Special Agent Kang and other government agents. *Rajaratnam*, 719 F.3d at 154–56.  The Second

Circuit also found that the other two categories of misstatements and omissions – withheld information affecting the credibility of a cooperating source and misquoted audio recordings – were immaterial to probable cause based on all the evidence provided in the affidavit. *Id.* at 157 ("assuming, *arguendo,* that these alleged misstatements and omissions regarding Roomy Khan and the two paraphrased conversations between Khan and Rajaratnam were indeed made with 'reckless disregard for the truth,' we agree with the District Court that they were not 'material'"). Importantly, while the Second Circuit affirmed the denial of the Motion to Suppress, it did not disturb Judge Holwell's findings that Special Agent Kang submitted an affidavit riddled with misstatements and omissions in an *ex parte* proceeding requiring a full, complete, and accurate statement of facts.

None of these prior judicial findings of misstatements and omissions were disclosed to the magistrate judge in this case in connection with any of the affidavits, despite probable cause resting largely on unsupported "beliefs."

## II.   Affidavits Contain No Facts Sufficient to Support Probable Cause

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  The probable cause standard requires "more than bare suspicion."  *Brinegar v. United States*, 338 U.S. 160, 175 (1949).  Rather, probable cause "exists where the facts and circumstances within [the officers'] knowledge and of which they had reasonable trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been

. . . committed." *Id.* at 175-76 (citation omitted). Application of a lesser standard would "leave law-abiding citizens to the mercy of the officers' whim or caprice." *Id.* at 176. Absent exigent circumstances, the probable cause determination must be made by a "neutral and detached magistrate." *Illinois v. Gates*, 462 U.S. 213, 240 (1983) (citation omitted). And officers must present sufficient information to that magistrate to allow her to conduct the required analysis. In other words, the magistrate's "action cannot be a mere ratification of the bare conclusions of others." *Id.* at 239.

Here, the affidavits submitted in support of the operative September 29, 2020 and October 13, 2020 warrants, attached hereto as Exhibits 1 and 3, were utterly lacking in factual content tying Mr. Klyushin to the suspected insider trading scheme or any other criminal misconduct. To the contrary, the affidavit's description of the crime under investigation focuses exclusively on four other individuals, Mikka Irzak, Igor Sladkov, Redacted , and Redacted . *See* Exhibit 1 at ¶¶ 12-34; Exhibit 3 at ¶¶ 12-19. The sum total of the relevant allegations regarding Mr. Klyushin is that he was "associated" with a Saxo Trading Account that reflected a January 23, 2020 transaction in one company whose records were potentially compromised. *Id.* at ¶ 20. The company reported its quarterly financial results that same day, and Irzak is alleged to have "sold short" the company's shares before the market close. *Id.* at ¶ 22.[12] This is clearly insufficient to "warrant a man of reasonable caution" in believing that Mr. Klyushin received inside information,

---

[12] The only remaining substantive allegations about Mr. Klyushin relate to his having exchanged WhatsApp messages with an individual named Ivan Ermakov and possibly met Ermakov "on the stock exchange." *See* Exhibit 3 at ¶ 25. This adds nothing meaningful to the probable cause analysis given the affidavit's utter failure to connect Ermakov to the suspected insider trading scheme.

much less traded on it.  The affidavits do not indicate that Mr. Klyushin was involved in gaining

unauthorized access to the company's information (or that he subsequently received that

information), that Mr. Klyushin was involved in the decision to trade the company's shares (rather,

the trading records were found on Ivan Ermakov's phone, and Ermakov was "believe[d]" to have

the ability to "execute trades," *id.* at ¶ 21), or that Mr. Klyushin had any contact with Irzak

whatsoever, much less communications on or around the day of the trading.  The foregoing facts

clearly distinguish other cases in which courts have found probable cause.  *See Ganek v. Leibowitz*,

874 F.3d 73, 86 (2d Cir. 2017) ("[E]vidence of receipt and trading is enough . . . to supply probable

cause to search each recipient's office for evidence of the overall insider trading scheme."); *United

States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 305 (S.D.N.Y. 2018) (noting allegations that the

defendant "had received material nonpublic information concerning" an acquisition, that the

defendant "had contacted" two other individuals "by phone and text," and that those two individuals

"had subsequently bought shares of [the company's] stock, which they sold immediately following

the public announcement of the acquisition").

        The September Affidavit is functionally identical to the subsequent October Affidavit, with

one notable exception: it asserts (with no specified basis) that the Saxo Trading Account with which

Mr. Klyushin was purportedly associated "is believed to have traded in parallel with IRZAK in

multiple publicly traded companies generally within hours of earnings announcements."  Exhibit 1

at ¶ 38.   This additional allegation cannot save either the September or October warrants.  For one

thing, the allegation was notably excluded from the October Affidavit.  More fundamentally, heavy

reliance upon the agent's mere "belie[f]" that parallel trading had occurred, with no basis stated in

the affidavit, contravenes the basic principle that the probable cause determination "must be made by a neutral and detached magistrate." *Gates*, 462 U.S. at 240.  Probable cause cannot be established "by affidavits which are purely conclusory, stating only the affiant's . . . belief that probable cause exists without detailing any of the underlying circumstances upon which that belief is based." *United States v. Ventresca*, 380 U.S. 102, 108-09 (1965) (citation omitted).  Rather, the magistrate must personally evaluate those "underlying circumstances" if she "is to perform h[er] detached function and not serve merely as a rubber stamp for the police." *Id.* at 109.  In other words, the magistrate "must judge for h[er]self the persuasiveness of the facts relied on by a complaining officer to show probable cause." *Aguilar v. Texas*, 378 U.S. 108, 113 (1964).  The agent's "unsupported conclusion[]" is therefore "not entitled to any weight in the probable cause determination." *United States v. Vigeant*, 176 F.3d 565, 571 (1st Cir. 1999).  It reduces to a "mere" guess or "hunch," insufficient to establish even reasonable suspicion – let alone clear the higher probable cause bar. *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020).

Facts tying any purported misconduct by Mr. Klyushin to the Apple and Google accounts that the government sought authorization to search are even more clearly lacking.  The allegations regarding the Apple account are limited to the fact that the September search revealed it is associated with Mr. Klyushin and has "the iCloud backup feature turned on."  Exhibit 3 at ¶ 24. This is self-evidently insufficient to support a belief that the search would reveal evidence of a crime.  The only additional allegation regarding the Google account is that it received six emails from an address associated with "one of the leading banks in Russia['s] . . . investment and brokerage business." *Id.* at ¶ 29.  But the mere belief that Mr. Klyushin "may have another

16

brokerage account" does not come close to probable cause to search. *Id.* If it did, the government would have unfettered access to the electronic information of anyone trading in securities.

Lastly, even if, contrary to the foregoing, the agent's conclusory statement of belief is credited, the bare fact of parallel trading itself does not create probable cause to believe Mr. Klyushin was involved in insider trading – particularly where only one stock was allegedly traded in parallel with another alleged participant. This is especially so given the absence of any allegation that Mr. Klyushin directed trading in the Saxo Trading Account. In short, there was no probable cause to believe that Mr. Klyushin was a participant in any hacking and insider trading scheme or that any relevant evidence concerning the target offenses was located on his iCloud and Google accounts. Even Special Agent Kang's "beliefs" and conclusions – which were not predicated on broader trade analyses or other evidence – are not sufficient to meet the evidentiary requirement for seizing and searching all of Mr. Klyushin's iCloud and Google data. Certainly, there was insufficient probable cause for the searches once the affidavit is corrected to include damaging credibility revelations that further undermine Special Agent Kang's unsupported "beliefs."

### III.   Agent's Material Omission of Prior Findings Affecting His Credibility Requires a *Franks* Hearing

A defendant is entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), upon making "a substantial preliminary showing that (1) a false statement, (2) knowingly and intentionally, or with reckless disregard for the truth, was included in the warrant affidavit, and (3) the allegedly false statement is necessary to the finding of probable cause." *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002) (citation omitted). The "false statement" required by the first element may include "material omissions." *Vigeant*, 176 F.3d at 572.

17

Here, the affiant for both affidavits, Special Agent Kang, failed to disclose that he had previously been found to have made multiple misleading statements in affidavits submitted in support of a Title III application in another case.  *See United States v. Rajaratnam*, No. 09-CR-1184, 2010 WL 4867402, *10 (S.D.N.Y. Nov. 24, 2010) (finding omission of cooperator's criminal record "misleading, particularly when read with the literally false statement" regarding how long the cooperator had been working with the FBI); *id.* at *10-*11 (observing that affidavit's "summary of telephone conversations between" the cooperator and defendant did not "win high marks for candor" and that "[s]uch subtle shifts of meaning are not as compelling as direct misstatements and omissions, however, *they evince a lack of frankness that should be found in **all** ex parte applications*") (emphasis supplied); *id.* at *15 (noting "glaring omission" of fact "that the SEC had for several years been conducting an extensive investigation into the very same activity the wiretap was intended to expose using many of the same techniques the affidavit casually affirmed had been or were unlikely to be successful").[13] Special Agent Kang directly put his credibility at issue when he choose to premise probable cause on "beliefs" rather than evidence and analysis. If supporting

---

[13] The court in *Rajaratnam* ultimately found no *Franks* violation because, even after "correcting the affidavit to account for the government's misstatements and omissions, . . . there were enough facts for [the issuing judge] to have found probable cause."  2010 WL 4867402, at *13; *see also United States v. Rajaratnam*, 719 F.3d 139, 156-57 (2d Cir. 2013) (affirming this conclusion for misstatements regarding probable cause and finding that misstatement regarding necessity was not reckless).  But that says nothing about the relevance of the court's findings regarding Agent Kang's credibility.  And the showing of probable cause in *Rajaratnam* was exponentially stronger than that proffered here.  *See* 2010 WL 4867402, at *12 (noting that informer "admitted . . . that she had provided [the defendant] with inside information," that "the government was able to corroborate some of [her] statements," and that the defendant's "recorded telephone conversations with [the cooperator] independently show[ed] that he intended to get information about stocks from company insiders").

18

evidence was unavailable to him at the time, then further doubt arises as to the basis for his professed belief. Conversely, if evidence tying Mr. Klyushin or his trading accounts to a broader, parallel insider trading scheme *was* available, then he intentionally omitted it, leading the magistrate judge to find probable cause based solely on the four corners of the affidavit – which in this case rested on conclusory beliefs, making the agent's credibility crucially important.

"The fact that [Agent Kang] submitted a tainted affidavit" in a prior case "casts a certain degree of doubt upon his credibility as an affiant." *United States v. Southard*, 700 F.2d 1, 9 (1st Cir. 1983). Agent Kang's failure to disclose information affecting his credibility for consideration by the issuing magistrate was, given the importance of his beliefs and conclusions to the issue of probable cause, at the very least reckless,   Further evidencing the reckless or intentional nature of the omission is Special Agent Kang's shifting language regarding his beliefs, which conspicuously dropped the key allegation that Mr. Klyushin's Saxo Trading Account "traded in parallel with IRZAK in multiple publicly traded companies …," *compare* Exhibit 1 ¶ 38, *with* Exhibit 3 ¶ 23, from the operative October Affidavit. The materiality of the omission is enhanced by the paucity of hard facts tying Mr. Klyushin to the alleged scheme, and Agent Kang's repeated invocation of his training and experience in this type of investigation to support a finding of probable cause. The heavy reliance upon Agent Kang's credibility is especially clear in the September Affidavit, which rests the allegations of parallel trading exclusively on "belief." Exhibit 1 ¶ 38. "[W]hich is believed," in plain English, means the affiant, Agent Kang, believes. But Agent Kang failed to provide the issuing judge an evidentiary basis for his belief — either because he lacked any and wanted to fish for one as backfill or because he had one and chose not to share it with the issuing

judge. Regardless, having failed to supply an evidentiary basis for his belief, Agent Kang was

essentially asking the issuing judge to take his word for it. And in determining whether his word

was worthy of belief, the issuing judge deserved to know that a federal judicial colleague had

previously raised serious questions about Agent Kang's candor in another private warrant

proceeding. In trumpeting his experience and expertise yet withholding Judge Holwell's

expressed credibility reservations while asking the issuing judge to rely on his unsubstantiated

word — to accept his evidence-free belief at face value — Agent Kang misled the issuing judge

in a critically material way.

To the extent that this Court, despite the foregoing analysis, *see supra* 13-17, finds that this

allegation supports probable cause, it must also conclude that the omission of information highly

relevant to Special Agent Kang's credibility was material.

## IV.    Warrants Fail to Set Forth Items to be Seized with the Requisite Particularity

The Fourth Amendment expressly requires that search warrants "particularly describe[e] the

place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The founders

intended the so-called "particularly requirement" to "make[] general searches . . . impossible and

prevent[] the seizure of one thing under a warrant describing another.  As to what is to be taken,

nothing is left to the discretion of the officer executing the warrant."  *Marron v. United States*, 275

U.S. 192, 196 (1927).  "Vivid in the memory of the newly independent Americans were those

general warrants known as writs of assistance under which officers of the Crown had so bedeviled

the colonists. . . . They were denounced by James Otis as 'the worst instrument of arbitrary power,

the most destructive of English liberty, and the fundamental principles of law, that ever was found

in an English law book,' because they placed 'the liberty of every man in the hands of every petty officer." *Stanford v. Texas*, 379 U.S. 476, 481 (1965). "The particularity requirement demands that a valid warrant: (1) must supply enough information to guide and control the executing agent's judgment in selecting where to search and what to seize, and (2) cannot be too broad in the sense that it includes items that should not be seized." *United States v. Kuc*, 737 F.3d 129, 133 (1st Cir. 2013).

The warrants at issue here effectively authorized the search of Mr. Klyushin's entire iCloud and Google accounts. *See* Exhibits 2, 4, and 5. They expressly permit agents to search and seize:

> For the period January 1, 2018 to the present, all information . . . that constitute[s] evidence, fruits, and instrumentalities of violations of offenses including wire fraud, . . . conspiracy to commit wire fraud, . . . fraud and related activity in connection with computers, . . . money laundering and conspiracy to commit money laundering, . . . securities fraud, . . . and conspiracy to commit securities fraud, including records relating to the following . . . .

Exhibit 2 at 10; Exhibit 4 at 10; Exhibit 5 at 10. The warrants go on to list many, expressly non-exclusive, categories of documents. On their face, the warrants permit government agents to rummage through the accounts for evidence of any crime.[14] This is precisely the type of general warrant that the particularity requirement forbids. *See, e.g.*, *In re Grand Jury Subpoena, JK-15-029*, 828 F.3d 1038, 1088 (9th Cir. 2016) (holding subpoena which failed to "limit the documents demanded to those within the scope of the government's legitimate concern" to be "unreasonably

---

[14] *Kuc* is distinct because the warrant in that case was limited to "evidence, fruits, and instrumentalities" of the specific statutory violations being investigated. 737 F.3d at 131-32. By contrast, the list of offenses here is expressly non-exclusive, affording agents the ability to search for evidence of any conceivable offense.

overbroad" and "analogous . . . to a general warrant"); *Warshak v. United States*, 490 F.3d 455, 476 (6th Cir. 2007), *reh'g en banc granted, opinion vacated* (Oct. 9, 2007) ("If the e-mails are seized pursuant to a warrant, the Fourth Amendment's particularity requirement would necessitate that the scope of the search somehow be designed to target e-mails that could reasonably be believed to have some connection to the alleged crime being investigated.").

Even ignoring the virtually unlimited prefatory language, the subsequent non-exclusive list of categories also runs afoul of the particularity requirement. Essentially, those categories include any and all financial documents for the nearly three-year relevant timeframe. *See, e.g.*, Exhibit 2 at 11 ("[d]ocuments or communications regarding" any "bank[]") ("[e]vidence of transactions conducted or contemplated in publicly traded companies"); Exhibit 4 at 11 (similar). The warrants do not in any way limit the search to particular transactions or companies believed to be implicated by the alleged scheme. *Cf. Kuc*, 737 F.3d at 133 (noting that warrant "detail[ed] the companies that [the defendant] was suspected of defrauding"). Accordingly, they go far beyond the scope of any conceivable probable cause.[15]

## V.     The Good Faith Exception to the Exclusionary Rule does not Apply

While suppression is not required in cases where officers act in "objectively reasonable reliance on a subsequently invalidated search warrant," this so-called "good-faith exception" is

---

[15] To the extent any minimal additional detail can be gleaned from that warrant application or supporting affidavit, such content is "outside the scope" of the particularity analysis "and cannot save the actual warrant from its failure to provide an adequate description." *United States v. Moss*, 936 F.3d 52, 59 (1st Cir. 2009) (citing *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)). "The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." *Groh*, 540 U.S. at 557.

inapplicable where officers "have no reasonable grounds for believing that the warrant was properly issued." *United States v. Leon*, 468 U.S. 897, 922-23 (1984).  Suppression is also required "if the magistrate . . . in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *Id.* at 923.

Agents could not have reasonably relied on the warrant at issue here.  For one thing, the operative October Affidavit set forth essentially no factual content tying Mr. Klyushin to the suspected insider trading scheme in any manner.  It certainly, on its face, did not give rise to probable cause justifying the search of his entire Apple and Google accounts.  The September Affidavit's passing allegation regarding parallel trading, to the extent it is considered at all, was the type of conclusory statement that, for decades, has been held to carry no weight in the probable cause analysis.  *See, e.g.*, *Ventresca*, 380 U.S. at 108-09.  Agent Kang's reckless failure to disclose that he had previously been found to have made several misleading statements in support of Title III applications independently precludes a finding of good faith. Scrupulous candor in *ex parte* proceedings is important – now more than ever – to preserve public confidence in the FBI and official institutions more broadly. Suppression of evidence obtained by an agent who previously made omissions and misstatements and continues to skate near or over the line in matters materially affecting credibility – an apparent repeat offender - is uniquely appropriate for general and specific deterrence.

## VI.    Conclusion

Based on all the foregoing, the defense respectfully requests this Honorable Court to hold a *Franks* hearing and to suppress from evidence of any materials obtained, or any fruits of such

evidence, that were unlawfully seized by the government pursuant to the three search warrants

targeting Mr. Klyushin, issued on September 29 and October 13, 2020.

### COMPLIANCE WITH LOCAL RULE 7.1(a)(2)

Counsel for the government has indicated that it opposes this request.

Respectfully Submitted,
Vladislav Klyushin,
By His Attorney,

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.
Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
menemtsev@gmail.com

**/s/ Marc Fernich**
Marc Fernich
Law Office of Marc Fernich
800 Third Avenue
Floor 20
New York, NY 10022
212-446-2346
Email: maf@fernichlaw.com

Dated: September 20, 2022

<u>**CERTIFICATE OF SERVICE**</u>

I, Maksim Nemtsev, hereby certify that on this date, September 20, 2022, a copy of the foregoing documents has been served via Electronic Court Filing system on all registered participants.


<u>**/s/ Maksim Nemtsev**</u>
Maksim Nemtsev, Esq.

25