UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

)
)
UNITED STATES OF AMERICA              )
)
v.                                    )          No. 21-cr-10104-PBS
)
VLADISLAV KLYUSHIN,                   )
Defendant                             )
)
_____      )

**DEFENDANT VLADISLAV KLYUSHIN'S SENTENCING MEMORANDUM**

Vlad Klyushin has demonstrated many admirable traits throughout his lifetime. Born into relative poverty and having to work from the age of 13 to help pay for his and his family's expenses, Vlad worked hard, finished college, obtained a master's and a doctorate degree, and started multiple successful businesses, which provide for hundreds of employees and their families. Along the way he was blessed by a full life: he married, had five loving children (ages 6 to 14), and has the love and support of his family and large network of friends. As the 17 letters submitted to the Court describe in detail, Vlad has often displayed extraordinary compassion, generosity, and civic and charitable commitment. Letter after letter detail a caring and supportive husband, a deeply involved father, an empathetic and dependable friend to many, and a man who routinely and regularly does good deeds, large and small, without an expectation of anything in return.

The issue presented here, as in all sentencing proceedings, is "what" punishment is fair, necessary, and appropriate, given all the relevant facts and circumstances; or, in the words of 18

1

U.S.C. § 3553(a), what sentence is "sufficient, but not greater than necessary," to serve enumerated sentencing goals.  For all of the reasons detailed herein, as well as those to be presented at sentencing, the defense respectfully requests this Honorable Court to impose the most lenient and compassionate sentence that would take into consideration the nature of Mr. Klyushin's conduct, the punishment that has already been inflicted, his history of good deeds, and not just the proof of wrongful conduct that was featured by the prosecution in its pretrial and trial presentations and arguments. The defense respectfully submits that a term of incarceration not to exceed 36 months would be a fair and just sentence in this case, and certainly "sufficient" to meet the sentencing goals set forth in §3553(a).

## I.  Personal Background

Born in the Moscow region, Mr. Klyushin is 42 years old. PSR at ¶158. His mother, Irina, was just 19 years old at the time he was born. PSR at ¶161. Mr. Klyushin never met his father and was primarily raised by his mother, his stepfather, and his grandparents. PSR at ¶ 159 and ¶ 160. While both his stepfather and his mother worked, the family struggled financially and "occasionally had limited food and clothing." PSR at ¶159. To help pay for the family's expenses, Mr. Klyushin started working at the age of 13. *Id.*  Mr. Klyushin's stepfather drank "alcohol excessively" and was killed during a car robbery when Mr. Klyushin was just 14 years old. PSR at ¶159 and 161. Despite these difficulties, Mr. Klyushin finished high school at the age of 16 and went on to obtain a college degree, a master's degree, and a doctorate degree. PSR at ¶183. After working for multiple companies and as an adjunct professor at the Moscow State Linguistic University, Mr. Klyushin founded numerous successful businesses across a wide range of industries, including the IT company, M-13. PSR at ¶¶ 184-189.

2

In 2008, Mr. Klyushin married his first wife, Sophia, with whom he shares two children. PSR at ¶164, 165, and 166. Unfortunately, the marriage was tumultuous and ended in separation and then subsequent divorce in 2012. PSR at ¶164 and 179. In 2014, Mr. Klyushin married Zhannetta Kliushina. Together, the couple has three children.

In her letter, Zhannetta describes Mr. Klyushin as "very loving husband, wonderful man and caring father," who "always finds [time] for his family."  Letter of Zhannetta Kliushina, attached hereto as Exhibit 1. Others around him, including his closest friends, similarly describe Mr. Klyushin as a responsible father that never misses important milestones:

> Vladislav is the best and responsible father [amongst] people I know. He never missed a single family gathering nor his children' or friends' birthday.
>
> As a fa[]t[h]er of five, he took part in preparations of every of his child 's birthday parties. He comes up with competitions and activities, makes up time plan for events. Also he decorated the house for the party. His passion with his kids speaks about him as a reasonable and wise man. His conversations with children helped them through life a lot. Considering the tough life of a teenagers in our social media era, he always found right words to call everyone down and resolve teenage problems.

Letter of Anna Cherepkova, attached hereto as Exhibit 2.

> Vladislav grew up without [a] father, and my family, my parents always treated him as a son, that is why now I and my whole family are so hard worried about his fate.
>
> When Vladislav's eldest son was born, he invited me to become his godfather. I took this offer with great pride, swearing an oath to God that whatever happens we will always be together, we will never abandon each other and support our families and our children.
>
> Since then, Vladislav had four more children, and despite the fact that there were five of them, he always found time for each of them, paying attention to everyone and each individually. Despite the great personal professional workload, he knew what his children live is, what they are fond of, what

victories and defeats they have, what joys and experiences. He always remained a sensitive, loving, kind husband, father, friend, and man.

Letter of Evgeniy Buyanov, attached hereto as Exhibit 3.

Mr. Klyushin's generosity and selfless nature extends well beyond his family. Indeed, Mr. Klyushin displays the same compassion and kindness to everyone around him:

I want to note that Vladislav treats his many employees very warmly, not even as subordinates, but as those who are near and dear to him, friends, colleagues. For me personally, over the years Vladislav has become more than just a company leader, but a friend on whom you can always count to give [] advice or help.

Letter of Boris Leonov, attached hereto as Exhibit 4. He is vested in the "self-development of employees, even if the financial benefits from it are uncertain." Exhibit 4. He makes sure that everyone is heard. Exhibit 4. And, most importantly, Mr. Klyushin makes sure that he is there for anyone in their time of need:

In December 2015, I had an accident, I fell and the joint and several bones in my foot got fractured. I told this only to my colleague in the office and called an ambulance. A colleague passed the information to Vladislav, and he immediately sent a driver and ordered to take me to the best trauma center in our entire country. In fact, he paid out of his own funds for an expensive emergency operation and further treatment, and only thanks to his quick response and generosity, I did not become disabled and can still walk. He did all this out of the goodness of his heart. He never asked for any reimbursement of costs, and in general never touched upon the cost of treatment in our further communication.

A similar situation happened with my colleague who, as a result of an epileptic seizure, received a compression fracture of the spine. It was also only thanks to Vladislav that he did not become disabled.

Exhibit 4.

This was the case in 2018, when I asked him to assist with getting inpatient treatment for my father's oncology. This was the case last year, when, to improve my daughter's living conditions, I had to take out a mortgage loan for 5 years with a monthly payment too large for me. Having learned about this, V.D. Klyushin not only promised that the management of the company "M 13" would help me

repay this mo1tgage loan ahead of schedule, but also, taking into account my conscientious attitude to work, he rewarded me several times with significant bonuses so I would be able to repay my debt to the bank as soon as possible.

Letter of Vadim Koval, attached hereto as Exhibit 5.

The most revealing and defining story about Vladislav for me happened during my second year in the company…. One night I was awoken by a phone call from one of my colleagues who's fallen sick: he had an asthma attack and was periodically losing consciousness, he couldn't say his address or call anyone else. So the first thing I did was to call Vladislav for help. And he came through. He calmed me down, called the ER and organized the best medical care for my colleague. After that I fully understood that he wasn't someone who gave fake speeches about the importance of becoming a "work family", he really did care….

Letter of Alex Doronina, attached hereto as Exhibit 6; Letter of Pert Alekseev, attached hereto as Exhibit 7 ("Vladislav is known to a narrow circle of people for his charity work. Few people know that he helps people in different life situations without advertising it."); Letter of Elena Zakharova, attached hereto as Exhibit 8 ("I found myself in an extremely difficult financial situation, virtually without housing and funds, alone with a 6-month-old child. I turned to Vlad for help, because I really needed urgent legal advice, and there was no money for this. Vlad immediately responded and helped me solve the legal issue very quickly and efficiently. In addition, after learning about the situation and my plight, he offered me an opportunity to work from home, which really saved our lives, and for that I am forever grateful to him."); Letter of Asiya Rakhamutlina, attached hereto as Exhibit 9 ("Vladislav is not just an empathetic person. It's in his blood: he can't be a passer-by in your life, he always has time, he's always involved in the lives of all the people around him."); Letter of Ekaterina Dubovitskaya, attached hereto as Exhibit 10 ("Vladislav is an example of kindness, empathy, honesty, and decency."); Letter of Olga Arsenyeva, attached hereto as Exhibit 11 ("It was impossible not to notice Vladislav's

openness and friendliness towards all employees of the company."); Letter of Ksenia Mednivoa, attached hereto as Exhibit 12 ("He paid for treatment for two employees, helped my colleagues when they lost their relatives, and was involved in charity work."); Letter of Ekaterina Velichko, attached hereto as Exhibit 13. Even when his company lost contracts because of his highly publicized arrest, Mr. Klyushin injected the company with his own funds to cover employee salaries. *See* Letter of Aleksandr Badikov, CEO of M13, attached hereto as Exhibit 14.

Similarly, Mr. Klyushin is an avid contributor to the church and various charities. *See* Letter of Olga Parshkova, attached hereto as Exhibit 15 ("Three years ago Vladislav helped in the repair of the Sretensky Monastery in Moscow. …Vladislav repaired everything for them, of course, free of charge"); Letter of Vladimir Chernetsky, attached hereto as Exhibit 16 (sponsoring the Russian Tretyakov Gallery of Arts); Letter of Dmitry Pachulia, attached hereto as Exhibit 17 (working on the "preservation of artistic historical heritage…"); *see also* Letter from Lighthouse Charity Foundation, attached hereto as Exhibit 18; Letter from Charity Fund Sheredar, attached hereto as Exhibit 19.

In short, throughout much of his life, Mr. Klyushin quietly helped others in need (asking for and expecting nothing in return), has steadfastly offered the kind of friendship and support any person would cherish, and has been an unwavering foundation of support and care to everyone around him.

## II. Circumstances of Offenses

While Mr. Klyushin does not, in any respect, seek to depreciate or minimize the gravity of his offenses of conviction. He does seek to place his conduct in the proper context, including the fact that he did not direct or devise any intrusions and the fact that he did not direct the

trading at issue in this case. These discrete points of contention are potentially material to the Court's threshold determination of the correct Sentencing Guideline and then to the imposition of a fair and just sentence.

       **a.**        **Mr. Klyushin did not direct or devise any intrusions.**

The government attributes responsibility for commencing and continuing the unauthorized intrusions into DFIN and TM's servers largely to Mr. Klyushin and his company, M-13. *See e.g.,* PSR at ¶¶ 21-26.

In fact, trial evidence showed that intrusions started as early as September 2017. Daron Hartvigsen, a cybersecurity specialist for DFIN testified that his team located *Empire PowerShell* activity (activity that he associated with unauthorized intrusions) on their systems as early as September of 2017. Tr. 2-1-23 30:21-30:22 ("So one of them was September of 2017, and the other one was, I believe, November of 2019."). It is indisputable that Mr. Klyushin did not have a trading account until July of 2018 – nearly 10 months after the initial *Empire Powershell* activity was located on DFIN's servers. Moreover, the evidence presented at trial showed that Mr. Klyushin did not know Mr. Ermakov until March 17, 2018, when Mr. Ermakov was first added to Mr. Klyushin's phone book. *See* Trial Exhibit 363. There was simply no evidence that Mr. Klyushin directed any intrusions into DFIN or TM's servers in September 2017, in January 2018 (the start of the alleged conspiracy), or at any other point in time.

Furthermore, the sole individual who had a trading account in 2017 was Mr. Sladkov, who also possessed unreleased earnings reports as early as October of 2017 and February of 2018. There was no evidence that those or any other unreleased earnings reports were located on Mr. Klyushin's devices or that any unreleased earnings reports were transmitted to Mr. Klyushin.

There was similarly no evidence that Mr. Klyushin knew or ever communicated with Mr. Sladkov and Mr. Irzak. Indeed, Mr. Sladkov and Mr. Irzak's phone numbers were not stored on Mr. Klyushin's iCloud account and a search of Mr. Klyushin's iCloud account – which contained millions of files including 130,505 messages – yielded no results for Mr. Sladkov or Mr. Irzak's names, phone numbers, or any references to DFIN or TM. *See* Trial Exhibit 353. The government separately indicted Messrs. Sladkov and Irzak. And, although a Rule 16 discovery letter noticed the men as co-conspirators, the government insisted in summation that the jury need not find they were conspirators of Mr. Klyushin. Tr. 2-10-23 89:25-90:1 ("frankly, you don't even have to find that Sladkov was part of the conspiracy").

Finally, the method and means of intrusions were the same – both before Mr. Klyushin had a trading account and afterwards. The same *Empire Powershell* activity that was observed in September 2017 was observed in November 2019. Tr. 2-1-23 30:21-30:22. The same publicly available software, *e.g., Mimikatz*, was used by intruders both before and after Mr. Klyushin acquired a trading account. In short, there was no evidence that Mr. Klyushin directed or devised the intrusions into DFIN and TM's servers.

     **b.**    **Mr. Klyushin did not direct the trading in this case.**

Similarly, the government contends that "Klyushin directed the trading in his and the Investors' accounts," which is, again, inconsistent with the evidence presented at trial. PSR at ¶ 43. Trial evidence showed that Mr. Klyushin provided Mr. Ermakov[1] and Mr. Rumiantcev with

---

[1] There was no evidence that Mr. Ermakov was an M-13 employee during the bulk of the charged conspiracy period. The earliest reference to Mr. Ermakov's employment at M-13 was in March of 2020. *See* Trial Exhibit 58A. Conversations between Mr. Ermakov and Mr. Klyushin prior to March of 2020 are consistent with Mr. Ermakov not being employed by M-13, including

access to his accounts and the accounts of his investors; however, Mr. Klyushin did not direct the purchase/sale of securities, the timing of the decision to purchase/sell, or the size of the purchases/sales. Indeed, Mr. Klyushin was not a participant in the Threema chat (Trial Exhibit 46) where Mr. Rumiantcev and Mr. Ermakov discussed the purchase and sale of stocks until May 13, 2019 – almost a year following the start of Mr. Klyushin's trading account. And even upon joining what the government alleged was a secretive chat, Mr. Klyushin openly told Mr. Rumiantcev and Mr. Ermakov that "I am a little of use in active trading…," *Id.* The fact that Mr. Klyushin received post-trade reporting is not evidence that he directed the trading at issue in this case. There was no evidence that Mr. Klyushin required Mr. Ermakov or Mr. Rumiantcev to seek or obtain his approval prior to making a trade. The only approval required from Mr. Klyushin was to hire additional staff to support Mr. Ermakov and Mr. Rumiantcev's analyses and trading. Trial Exhibit 46.

In short, there was no evidence that Mr. Klyushin possessed or reviewed any undisclosed earnings reports or that he ordered anyone to buy or sell a particular stock based on undisclosed earnings reports.

### III.  Guidelines Sentencing Range

Supreme Court and First Circuit precedents confer broad discretion on this Court to determine the appropriate sentence in individual cases. *See, e.g.*, *Gall v. United States*, 552 U.S. 38 (2007). "[O]nce the guidelines sentencing range [GSR] is properly calculated, sentencing becomes a judgment call for the court, and the court may construct a sentence varying from the guidelines sentencing range based on a complex of factors whose interplay and precise weight

---

conversations on May 5, 2019, where Mr. Klyushin invites Mr. Ermakov to work for M-13.

cannot even be precisely described." *United States v. Innarelli*, 524 F.3d 286, 291 (1st Cir. 2008) (citation omitted).

### a.      Gain Enhancement

"Imposing a sentence on a fellow human being is a formidable responsibility," "a court [must] consider, with great care and sensitivity, a large complex of facts and factors" rather than just focusing on the amount of money gained. *United States v. Gupta*, 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012). The applicable USSG §2B1.4 guideline, however, is driven exclusively by the amount of gain. "By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *Id.* 904 F.Supp.2d at 351.  As Judge Rakoff has poignantly explained:

> The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables ***wars with common sense***.  Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to ***bizarre results***.

*Id.* at 350 (emphasis added).

Beyond the general concern about "sentencing by numbers", several jurists have criticized the §2B1.1 loss table (which is incorporated into §2B1.4) on the grounds that the astronomical sentencing increases it calls for are utterly lacking in empirical support.  Indeed:

> the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of ***speculation, whim, or abstract number-crunching*** than of any rigorous

> methodology—thus maximizing the risk of injustice. . . .  The
> Guidelines' calculations for this offense are no longer tied to the
> mean of what federal judges had previously imposed for such
> crimes, but instead reflect an ever more draconian approach to
> white collar crime, unsupported by any empirical data.

*Id.* at 351 (emphasis added); *see also United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir.

2016) ("[T]here is reason to believe that, because the loss Guidelines were not developed using

an empirical approach based on data about past sentencing practices, it is particularly appropriate

for variances.").

        As the Second Circuit has recognized, disagreement with the Sentencing Commission's

"unusual[]" approach to white-collar offenses "is a circumstance that a sentencing court is

entitled to consider" in imposing a variant sentence. *United States v. Algahaim*, 842 F.3d 796,

800 (2d Cir. 2016) (citing *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). And district

courts have, in practice, repeatedly varied downward from large Guideline sentencing ranges

driven by loss or gain amount.  In doing so, several courts have been harshly critical of fraud-

related Guidelines.  *See United States v. Johnson*, No. 16-CR-457, 2018 WL 1997975, at *3

(E.D.N.Y. Apr. 27, 2018) (Garaufis, J.) (imposing 24-month sentence despite GSR of 87-108

months, and observing, "[a]s far as this court can tell, the Sentencing Commission's loss-

enhancement numbers ***do not result from any reasoned determination of how the punishment***

***can best fit the crime, nor any approximation of the moral seriousness of the crime***."

(emphasis added)); *Gupta*, 904 F. Supp. 2d at 355 (varying downward from GSR of 78-97

months to impose 24-month sentence); *United States v. Adelson*, 441 F. Supp. 2d 506, 512

(S.D.N.Y. 2006) (sentencing defendant to three and one-half years despite guideline range of life

imprisonment and noting "***the utter travesty of justice that sometimes results from the***

*guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense*" (emphasis added)); *United States v. Parris*, 573 F.Supp.2d 744, 745 (E.D.N.Y. 2008) (varying downward from GSR of 360 months to impose 60-month sentence and observing "it is difficult for a sentencing judge to place much stock in a guidelines range that *does not provide realistic guidance*" (emphasis added)); *see also* Mark H. Allenbaugh, *Drawn from Nowhere: A Review of the U.S. Sentencing Commission's White–Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 23 (2013) ("It appears that in practice, loss has very little correlation to the ultimate sentence imposed, regardless of how it determines the advisory guideline range."). In short:

> Where . . . the calculations under the guidelines have *so run amok that they are patently absurd on their face*, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.

*Adelson*, 441 F. Supp. 2d at 515 (emphasis added). Relying on the Guidelines loss table in this case, intuitively strikes the wrong chord. The reason is that the table is designed to apply in a securities fraud case where a defendant has caused real or intended loss to victims by defrauding them of their money. Looked at this way, the loss table serves a useful function in recognizing that a greater loss causes greater harm, and a concomitantly greater guidelines sentence. In an insider trading case, as here, computer algorithms "matched" parties who were already pre-disposed to engage in a trade. The trades were done blindly and at arms-length—that is, the sellers wanted to sell irrespective of whether a trader was going to buy (or vice versa). If Mr. Klyushin did not buy the security, someone else would have. Relying on the table in this case

measures culpability based on gain, but the amount of gain bears no connection to an identifiable harm or level of culpability; it is simply a function of how much money the defendant chose to invest in a stock trade and whether the trade turned out to be profitable. The defense submits that, for these reasons, the Court can and should disregard the gain driven GSR and impose an individualized sentence based on the particular facts and circumstances of this case.[2]

But even for the purpose of correctly calculating the Guideline, the government's calculated gain ($98 million or the $93 million alternative calculation it submitted on July 17, 2023),[3] which increases Mr. Klyushin's offense level by four-fold (from 8 to 32, not including any other enhancements), is incorrect in several respects.

First, the $98 or $93 million figure includes trading which was not known to and was not reasonably foreseeable to Mr. Klyushin. *See* U.S.S.G. § 1B1.3(a)(1)(B). For sentencing purposes, a defendant is "not automatically . . . responsible for all the losses caused by the jointly undertaken criminal activity." *United States v. Pizarro-Berrios*, 448 F.3d 1, 6 (1st Cir. 2006). Rather, the Court "must make an individualized determination regarding the amount of loss attributable to, or reasonably foreseeable by, a [particular] defendant." *Id.* at 7.

---

[2] Indeed, the GSR for Mr. Klyushin, as currently calculated by probation, is the same as for a defendant convicted of distributing more than 36 kg of fentanyl, or more than 90 kg of heroin, or more than 90,000 kg or marijuana. Mr. Klyushin's GSR is significantly higher than for a hypothetical defendant convicted of kidnapping in which the victim sustained serious bodily injury; or for a defendant convicted of sexually exploiting a minor under 12 years old by production of sexually explicit material. *See United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013), *as corrected* (July 24, 2013) (Underhill, J. concurring) ("The higher the loss amount, the more distorted is the guideline's advice to sentencing judges.").

[3] For comparison, accounts in Mr. Klyushin's name made either $20,902,031 or $19,107,383 depending on the government's calculation.

"Before attributing gains to a defendant under § 2B1.4's gain analysis, a sentencing court should first identify the scope of conduct for which the defendant can fairly be held accountable for sentencing purposes under § 1B1.3. After identifying the scope of conduct, the court should then analyze that conduct to determine whom the defendant 'act[ed] in concert with' and to whom he "provided inside information[.]'" *United States v. Metro*, 882 F.3d 431, 440 (3d Cir. 2018) (internal citation omitted). As detailed above, Mr. Klyushin never knew of, communicated with, or worked with Mr. Sladkov or Mr. Irzak, who combined earned approximately $50 million of the alleged $93 or $98 million in profits. Mr. Klyushin similarly did not send or receive any undisclosed earnings report from Mr. Sladkov or Mr. Irzak and had no knowledge of the trading conducted by these two individuals. Moreover, Mr. Sladkov and Mr. Irzak began trading in securities nearly 6 months before Mr. Klyushin met Mr. Ermakov and nearly 10 months before Mr. Klyushin had a trading account.[4] There was similarly no jury finding that Mr. Sladkov and Mr. Irzak were coconspirators of Mr. Klyushin. There was no special verdict form and no jury finding as to who was or was not a member of the conspiracy. Indeed, the government argued at trial that "you don't even have to find that Sladkov was part of the conspiracy." Tr. 2-10-23 89:25-90:1. Accordingly, any gains from Mr. Sladkov and Mr. Irzak's trading should not be included in any sentencing enhancement. *Pizarro-Berrios*, 448 F.3d 1, 7 (1st Cir. 2006) (court "may not rely solely on what was charged in the jointly undertaken criminal activity count of an indictment…").

---

[4] The government's calculations attribute Mr. Sladkov and Mr. Irzak's gains to Mr. Klyushin from as early as January 2018.

Second, the government's $98 or $93 million figure assumes that every earnings-related transaction during the charged conspiracy period was based on material non-public information even though the charged conspiracy period extends beyond the date that DFIN's cybersecurity expert testified unauthorized access to its systems ceased and there was no evidence that each earnings-related transaction was based on unreleased earnings reports. "It is the government's burden at sentencing to prove sentencing enhancement factors by a preponderance of the evidence." *United States v. Lacouture*, 835 F.3d 187, 189-90 (1st Cir. 2016). Accordingly, such an enhancement "cannot be applied unless the government . . . prove[s] the predicate fact or facts" to be more likely true than untrue. *Id.* at 191 n.6. The government theorizes that the overlap between Mr. Klyushin's transactions and Mr. Sladkov's and Mr. Irzak's transactions (who were in possession of three unreleased earnings reports based on records seized from their iClouds) indicates that the basis for all transactions was material non-public information. However, a significant portion of Mr. Klyushin's trades ***did not*** overlap with Mr. Sladkov and Mr. Irzak's earnings-based trading. According to the government's own analysis, Mr. Klyushin engaged in 356 trades surrounding earnings events. Trial Exhibit 214. Mr. Sladkov and Mr. Irzak engaged in 386 and 495 earnings related trades, respectively. *See id.* However, only 227 of Mr. Sladkov's earnings related trades overlapped with Mr. Klyushin's and only 260 of Mr. Irzak's earnings related trades overlapped with Mr. Klyushin's. Trial Exhibit 255. Accordingly, Mr. Klyushin and Mr. Sladkov's trading overlapped approximately 58% of the time and Mr. Klyushin and Mr. Irzak's trading overlapped approximately 52% of the time. *See id.* Similarly, large portions of Mr. Klyushin's trading (approximately 30% of his trading) did not take place surrounding companies and earnings events serviced by DFIN and TM, *see* Trial Exhibit 217,

and the same trading (earning-based transactions involving companies serviced by TM and DFIN)[5] continued in Mr. Klyushin's accounts following the end of intrusions. The supposition that every earnings-related transaction was based on material, nonpublic information is simply unsupported, especially given that Mr. Klyushin traded based on other factors, *e.g.,* social media sentiment. Trial Exhibit 46 ("We are trading thanks to this know-how only. Everything is done by neuron networks plus monitoring.").

Finally, the gain analysis is further complicated by the requirement that gain under § 2B1.4 be determined not by a defendant's profits, but "by reference to the market price once the inside information has been revealed." *United States v. Chan*, 981 F.3d 39, 63 (1st Cir. 2020) ("using the value of the stocks the day after the results from the clinical studies became public" to determine gain). To get to its $98 million figure, the government used the sum of profit from all trading. In its most recent calculations, which yielded $93 million, the government used the market price of a security at the end of the next trading day (approximately 24- hours after the information was made public). The defense respectfully believes that the appropriate measure is the "size of the increase in the price of a company's shares from the time that [the defendant] purchased them to the time that the public learned the inside information." *United States v. Rajaratnam*, No. 09 CR. 1184 RJH, 2012 WL 362031, at *15 (S.D.N.Y. Jan. 31, 2012). In this case, the correct end price should be the price of a security following public release of the

---

[5] It is also not strange that a majority (but not all) of Mr. Klyushin's earnings-based transactions surrounded TM and DFIN serviced companies, who counted among their clients the largest companies in the United States and jointly serviced approximately 70% of companies comprising the S&P 500 and 80% of companies comprising the Dow Jones index.

earnings report or at most the market open price the day after an earnings report was made public.[6] While this may seem trivial, it has potentially significant effects on the gain calculation.

For example, on or about February 13, 2020, accounts in Mr. Klyushin's and his investors' name short sold 457,628 shares of ROKU at $139.05 to $139.75 per share for a total investment of $63,857,687. On February 13, 2020, at approximately 4:00pm, ROKU released its earnings report. *See https://www.cnbc.com/2020/02/13/roku-earnings-q4-2019.html* ("Shares of Roku rose as much as 9% after hours on the report but later settled around 5%.") which caused the stock's premarket price to increase to $159.40. A sale at the premarket price would have caused the investment to suffer a loss of approximately $9,088,216. At the time of market opening (February 14, 2020, at approximately 9:30AM), the price decreased to 149.19, which would similarly have caused an investment loss of $4,511,936. At the close of trading on February 14, 2020, the price decreased to $130.25, which would have caused a gain to Mr. Klyushin and investors in the amount of $4,251,640. The ROKU position was actually closed over time for a profit of approximately $50,000. The government only uses the latter two calculations to compute gain, but these methods as demonstrated above have the potential to overinflate gain and are inconsistent with using the price at the time "the public learned the inside information." *Rajaratnam*, 2012 WL 362031, at *15.

 b. **Organizer/Leader Enhancement**

The government also seeks a 4-level enhancement on the grounds that Mr. Klyushin was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. §3B1.1(a).  For purposes of this enhancement, it is not enough

---

[6] This would be approximately 12 hours+ after an earnings announcement is made public.

that Mr. Klyushin was technically a superior based on his ownership of M-13. Instead, the

relevant inquiry is whether Mr. Klyushin acted as an organizer or leader in the charged "criminal

activity."  *Id.*; *see also United States v. Flores-De-Jesus*, 569 F.3d 8, 34 (1st Cir. 2009).

    With this perspective, it becomes clear that Mr. Klyushin was a leader in title only. As

detailed above and argued at trial, Mr. Klyushin did not direct or devise any unauthorized

intrusions – which started as early as September 2017 – a time when Mr. Klyushin did not know

Mr. Ermakov and did not have a trading account.

    Similarly, while Mr. Klyushin provided his own funds for trading and solicited additional

funds from investors, there was no evidence that he ever obtained or reviewed an undisclosed

earnings report or that he directed the specific transactions at issue in this case. While Mr.

Klyushin was the owner of M-13 and financially benefited (primarily because of the amount of

money that he and investors invested, not because of his relative role), Mr. Klyushin was not the

leader or organizer of trading activity. Indeed, Mr. Ermakov and Mr. Rumiantcev conducted

trading without Mr. Klyushin's participation or direction, and for the bulk of conspiracy period

Mr. Ermakov was not an employee of M-13, *see supra* at n.1; *see also* USSG § 3B1.1, comment.

(backg'd) ("This section provides a range of adjustments to increase the offense level based upon

the size of a criminal organization (i.e., the number of participants in the offense) and the degree

to which the defendant was responsible for committing the offense.  This adjustment is included

primarily because of concerns about relative responsibility.") (emphasis added).

    Moreover, as the government argued at trial (and as to which there is no jury finding), the

conspiracy did not necessarily include Mr. Sladkov and Mr. Irzak – individuals that Mr.

Klyushin never met or spoke to. There is also no evidence that the investors Mr. Klyushin

attracted were "participants" within the meaning of § 3B1.1(a), i.e., "a person who is criminally responsible for the commission of the offense."  Accordingly, the defense respectfully submits that Mr. Klyushin was not "an organizer or leader" and that the criminal conduct that he was convicted of did not involve "five or more participants."

IV.        Section 3553(a) Factors

As in all sentencing proceedings, this Court is tasked with imposing a punishment that is "sufficient but not greater than necessary" to serve the enumerated statutory goals.  18 U.S.C. 3553(a).  Among other things, the Court should consider the nature and extent of the defendant's particular role in the offense; the punishment that has already been inflicted; his individual circumstances; sentences imposed on other defendants in other similar or related cases; and the likelihood of recidivist behavior.  In the circumstances of the present case, the defense respectfully submits that a sentence of no more than 36 months incarceration is "sufficient, but not greater than necessary" to serve § 3553(a)'s sentencing goals.

a.  **Specific and general deterrence.**

First, Mr. Klyushin is a first-time offender, having never previously been in contact with the criminal justice system, much less convicted of a crime. From a sentencing perspective, this fact is important. There is "a demonstrable difference in the recidivism rates of real first-time offenders as compared to other defendants in Criminal History Category I." *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007) (citation omitted); *see also* Amendments to the Sentencing Guidelines at 52, *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf ("Criminal History Category I includes offenders with

zero criminal history points and those with one criminal history point. Recidivism data analyzed by the Commission shows, however, that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point.") There is simply no need to subject Mr. Klyushin to numerous years of incarceration to specifically deter him. When the offense of conviction is an extreme departure from an otherwise well-led life and there is no likelihood of re-offense, a variance may be warranted. *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (affirming probationary sentence and temporary home confinement for wire fraud despite an 18 - 24-month guideline range, where appellate court construed district court to have termed the offense an "isolated mistake" in the context of Defendant's otherwise long and upstanding life). The Sentencing Guidelines, recognizing this fact, now direct courts to "consider imposing a sentence other than a sentence of imprisonment" for certain first-time offenders. U.S.S.G § 5C1.1. Application Note 4. Similarly, a future amendment to the Sentencing Guidelines authorizes a 2-point guideline reduction based on, *inter alia*, a defendant's lack of criminal history. *See* Amendments to the Sentencing Guidelines at 45. The defense respectfully contends that such variance is warranted for Mr. Klyushin, a first-time, non-violent offender.

The goal of general deterrence similarly does not require a lengthy period of incarceration. After being arrested in Switzerland on March 21, 2021, Mr. Klyushin was denied bail and was held alone in a cell for more than twenty-two hours per day. He was allowed to leave the cell for less than two hours per day and was allowed to speak to his family for less than one hour per month. His telephone contact with his counsel was similarly limited to less than one hour per week. In essence, Mr. Klyushin remained in solitary confinement from nearly 8 months

during his extradition proceedings in Switzerland. As multiple experts observed, prolonged

solitary confinement "inevitably impose[s] significant psychological pain," causing "severe

exacerbation of [] previously existing medical condition[s]," "physical disease," and even

"death". Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U. J.L. & Policy

325, 329 (2006). Because sensory and social deprivation is so toxic to healthy brain functioning,

the U.N. and various human rights organizations consider solitary confinement of more than 15

days as "torture." ACLU of New York, Solitary is Torture. Corrections Unions Want to Use it

More Often, https://www.nyclu.org/en/news/solitary-torture-corrections-unions-want-use-it-

more-often; *see also Davis v. Ayala*, 576 U.S. 257, 287 (2015) (Kennedy, J., concurring) ("even

for prisoners sentenced to death, solitary confinement bears a further terror and peculiar mark of

infamy") (internal citations and quotations omitted).

 Not only has Mr. Klyushin been punished by harsh conditions of pretrial confinement, his

business, which he has spent years building, lost multiple contracts valued at approximately $20

million per year. PSR at ¶ 172; Exhibit 14. The family that he cherishes has been devastated.

PSR at ¶ 172. His children from the first marriage have not been able to see his children from his

current marriage following Mr. Klyushin's arrest, and in his absence, Zhannetta has been forced

to assume all of Mr. Klyushin's former responsibilities. PSR at ¶ 174.  His physical and mental

health has greatly suffered as well.[7] *See* PSR at ¶ 172, 174, 176, and 177. In short, no rational

human being aware of what has occurred to Mr. Klyushin would ever knowingly and

intentionally choose to endure what he has experienced over the course of the past two and a half

---

 [7] Indeed, even this Honorable Court noted during trial how much Mr. Klyushin aged in
comparison to photographs taken just a few years earlier.

years. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."). Moreover, numerous studies have shown, there is "no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders." Zvi D. Gabbay, *Restorative Justice and White Collar Crime*, 8 CARDOZO J. CONFLICT RESOL. 421, 447-48 (2007); Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME &JUST. 1, 28 (2006) ("[I]nreases in severity of punishment [for white-collar crimes] do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels . . . reached that conclusion as has every major survey of the evidence.").

### b. Numerous additional years of incarceration are an unnecessary punishment in light of Mr. Klyushin's pretrial confinement and BOP's policies towards extradited defendants.

Section 3553 requires courts to consider "the kinds of sentences available" and "the need for the sentence imposed . . . to provide the defendant with . . . correctional treatment in the most effective manner." 18 U.S.C. §§ 3553(a)(3), (a)(2)(D). The extent to which a particular sentence comports with these authorities depends not only on whether and for how long a defendant is sent to prison, but also on the type of prison the person is sent to – a year in a minimum security FPC is a very different punishment than a year in a higher security institution. Reflecting this fact and the basic rationale that the punishment should fit both the offender and the crime, the vast majority of first time, non-violent offenders are sent to minimum security FPCs.

As detailed above, however, Mr. Klyushin already served a substantial term of incarceration (nearly 8 months in Switzerland) under conditions that solely because of his

extradition status were significantly more severe than what typical, similar U.S. citizens

defendant face either during pretrial detention or after sentencing.

Furthermore, once Mr. Klyushin is sentenced and placed into BOP custody, he will not

be permitted to serve his time at an FPC. Rather, he will be imprisoned in an institution far more

restrictive and hazardous than required:

> Ordinarily, after the imposition of sentence of imprisonment, a defendant with
> Klyushin's offense (non-violent), who has no history of violence, no prior
> criminal record, and no outstanding detainers would be eligible to be designated
> by the BOP to a minimum-security prison "camp." However, BOP designators
> also use Management Variables (MGTV) and Public Safety Factors (PSF) to
> account for security considerations not included in their numeric security point
> system. In Mr. Klyushin's case, if he is sentenced to a term of imprisonment,
> although he will have a total of only six (6) security level points, a PSF of
> "Deportable Alien" will be assigned to his security classification which will
> necessarily result in a prison assignment above the "minimum" (or camp) range.
> Mr. Klyushin will be designated as a low-security inmate, rather than as a
> minimum-security one. Low-security prisons generally have security protocols
> and living conditions far different than what exists at the minimum-security, camp
> level.

Letter of Joel Sickler, attached hereto as Exhibit 20 at 2. Adding to the harsher living conditions,

Mr. Klyushin will be incarcerated with a more hardened and dangerous prison population.

Exhibit 20 at 3-4 ("Statistically, there is a 143 percent greater chance of being assaulted at an

FCI as opposed to a camp. Furthermore, the rate of 'serious assault' is 553 percent higher in low-

security institutions than minimum-security camps.") (internal citations omitted). Mr. Klyushin

will also be subject to further incarceration after his sentence of confinements ends while he is

transported to ICE custody and awaits arrangements between the United States and the Russian

Federation to process his deportation:

> Mr. Klyushin's post incarceration return home will be further complicated by the
> difficulty of a U.S. Immigration and Customs Enforcement (ICE) detainer that

will be placed on him (upon incarceration) to eventually accommodate the process of deporting a foreign national at the completion of his sentence. ICE's Criminal Alien Program (CAP) is responsible for identifying, processing, and removing criminal aliens incarcerated in federal, state, and local prisons and jails - the enforcement of removal is overseen by ICE's Office of Detention and Removal Operations (DRO).

When the prisoner's sentence is complete, they are placed in ICE custody and their status is changed from "prisoner" to "detainee." Armed ICE agents would transport Mr. Klyushin (probably by bus) to another detention center once he is formally released from BOP custody to await the process of being physically removed from the U.S. Unfortunately, this involves further incarceration at what are typically county jails (contracted by ICE) to further wait on processing to finally be sent home.

Another disturbing result of the formal ICE deportation process is the length of time one can be held after their sentence has been satisfied. It can take up to six months for arrangements (internally within the U.S. and with officials of one's home country) to finalize the details necessary to complete this process. All the while an individual who should have been released from custody continues to languish in a strange and dangerous place while bureaucratic paperwork is half-heartedly shuffled between U.S. government agencies (no doubt the rising tension between the U.S. and Russia will further complicate and delay the process for Mr. Klyushin). Then there is the paperwork processed by the home country in coordination with the U.S. All of this is very time consuming and shows that an incarceratory sentence would impose a more substantial hardship on Mr. Klyushin than it would upon a similarly situated U.S. person.

*Id.* at 4-5.[8] Finally, because of his extradition and his immigration status, Mr. Klyushin would be ineligible for release to a Residential Re-Entry Center for the last 10% of his sentence; he would be ineligible to receive any credit for participation in RDAP; and will not likely receive credit for participating in First Step Act programming. *Id.* at 5-6. *United States v. Navarro-Diaz*, 420 F.3d

---

[8] The conditions in ICE detention facilities are often worse than actual prisons. A study by the ACLU of Massachusetts found, for example, extreme overcrowding of up to 400% capacity (forcing detainees to sleep on mattresses in converted gymnasiums), inadequate access to toilets and showers, inedible food, unsanitary water, abuse by guards, no recreation, and the mixing of violent and mentally ill detainees with the general population. *See* "Detention and Deportation in the Age of ICE," ACLU (2008), https://www.aclum.org/sites/default/files/wp-

581, 588 (6th Cir. 2005) (noting that convicted alien would serve "harsher time because [he would] not be eligible for halfway house placement"). The effect of Mr. Klyushin's extradition and non-citizen status is that he "would serve an in-custody period 87.5 percent longer than a comparable U.S. citizen," not including any additional time that he serves in ICE custody. Exhibit 20 at 7.

No evidence exists to show that the Sentencing Commission took the conditions of a pre-sentence detainee's confinement into account in creating the Guidelines. Indeed, there is no indication that the Commission contemplated that federal pre-sentence detainees would be kept in any detention facilities other than federal facilities. *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (Conditions of pre-sentence confinement, even in alien defendant's own country, could be severe enough to serve as basis for downward departure from the sentencing guidelines). Similarly, "the guidelines did not take into account the possibility that a defendant's alienage might significantly transform the severity of the entire length of his sentence, especially if the sentence is for an offense that is in no way intrinsically related to immigration." *United States v. Bakeas*, 987 F. Supp. 44, 50 (D. Mass. 1997) ("Both the inappropriate severity of the sentence, and the fact that it is due solely to Bakeas' non-citizenship, make a downward departure proper in this case."). For these reasons, the defense respectfully contends that a downwards departure or variance is warranted and that a sentence no greater than 36 months should be imposed. *See* U.S.S.G. § 5K2.0. (allowing sentencing court to depart if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the

content/uploads/2015/06/reports-detention-and-deportation-in-the-age-of-ice.pdf

guidelines.").

    **c.   Unwarranted sentencing disparity.**

Section 3553(a) specifically directs courts to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." There have been several criminal cases in the United States involving similar hack-and-trade prosecutions, all of whom received substantially below guideline sentences:

- *United States v. Arkadiy Dubovoy & Igor Dubovoy*, Dkt. 15-cr-00390-MCA (D.N.J.): Arkadiy and Igor Dubovoy, through hackers in Ukraine, obtained access to non-public press releases from PR Newswire, Marketwired, and Business Wire, all services which disseminated press release on behalf of publicly traded companies. The two defendants hired multiple traders to execute transactions based on material non-public information obtained from the unlawful intrusions. The defendants provided one of the traders with the necessities to execute the scheme, including computers, phones, and a software program enabling access to the server hosting the stolen releases. At a certain point, the defendants sought out an additional hacker once their access through the original hackers terminated. In total, the scheme generated approximately $30 million in illegal profits.

  - Arkadiy Dubovoy entered into a plea agreement and cooperated with the government's investigation. He was ultimately sentenced to time served (6 months and 7 days) based on a Guidelines Sentencing Range of 135-168 months. Dkt. 38 at 9-10

  - Igor Dubovoy similarly entered into a plea agreement and cooperated with the government's investigation. He was ultimately sentenced to time served (48 days) based on a Guidelines Sentencing Range of 97-121 months. Dkt. 35 at 10.

- *United States v. Vadym Iermolovych*, Dkt. 16-cr-00235-MCA (D.N.J.): Iermolovych was a Ukrainian hacker arrested in the Southern District of Texas. For nearly 4 years, Ieromolovych and other coconspirators infiltrated the computer network of PR Newswire, Marketwired, and Business Wire using stolen login credentials. *See* Dkt. 20. Ieromolovych advertised servers containing the stolen press releases and accepted payment for granting access to that information. Iermolovych pled guilty to a three-count information, including aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). His agreed Guidelines Sentencing Range was 41-51 months. Dkt. 24. He was sentenced to 30 months imprisonment. Dkt. 24.

26

- ***United States v. Vitaly Korchevsky*, Dkt. 15-cr-00381-RJD (E.D.N.Y.):** Between late 2010 and mid-2015, Korchevsky, a former Morgan Stanley vice president and FINRA license holder, obtained access to non-public press releases from PR Newswire, Marketwired, and Business Wire through Arkadiy and Igor Dubovoy. Dkt. 385 at 2. Korchevsky placed trades based on non-public information in accounts belonging to Arkadiy and Igor Dubovoy and his own personal brokerage accounts. *Id.* Additionally, Korchevsky created two investment funds that he used to make transactions based on material non-public information. "In mid-2015, right before their arrest, when Dubovoy became weary of continuing the scheme, Korchevsky pushed [Arkadiy] and Igor Dubovoy to get the stolen information and even gave them $500,000 to continue the trading." *Id.* at 3. In total, Korchevsky made more than $15 million in profit from illegal transactions. *Id.* at 2. Korchevsky was convicted at trial. The government calculated his Guidelines Sentencing Range at 210-262 months. *Id.* He was ultimately sentenced to 60 months imprisonment.

- ***United States v. Vladislav Khalupsky*, Dkt. 15-cr-00381-RJD (E.D.N.Y.)**: Khalupsky owned a trading business in Ukraine and was also a former registered broker-dealer in the United States. Dkt. 357. Starting in 2011, Khalupsky obtained non-public press releases from Arkadiy and Igor Dubovoy and helped them obtain the stolen information from another source when the Dubovoys lost access through initial hackers. *Id.* at 4. Through his trading Khalupsky made approximately $4.7 million in profit based on illicit information. *Id.* at 357. Korchevsky was convicted at trial. The government argued his Guidelines Sentencing Range was 135-168 months. He was sentenced to 48 months imprisonment.

- ***United States v. Leonid Momotok*, Dkt. 15-cr-00381-RJD (E.D.N.Y.):** Momotok was an additional trader hired by Arkadiy and Igor Dubovoy, who made more than $1.3 million through trades based on stolen information. Momotok was sentenced to a term of time served (less than 1 month).

- ***United States v. Alexander Garkusha*, Dkt. 15-cr-00381-RJD (E.D.N.Y.):** Garkusha knowingly obtained stolen information from Arkadiy and Igor Dubovoy and made a profit of $136,463. He was sentenced to time served (1 day).

- ***United States v. David Stone*, Dkt. 22-cr-00510 (S.D.N.Y.):** Stone was an IT professional, who provided IT support for businesses via remote access to their computer systems. Dkt. 32. Using credentials created for another user, Stone gained access to Motley Fool's system and downloaded confidential information about its upcoming stock recommendations. *Id.* Stone traded based on that information in his accounts, his wife's accounts, and his father's accounts. Stone also provided the information to a friend. In total, the scheme generated "more than $12 million in illicit profits." *See SEC v. David Stone*, Dkt. 22-cr-00510, Dkt. 1 at 2 (SDNY). Stone entered a plea of guilty and was sentenced to 28 months. No other traders were criminally charged.

In addition to the above, many hack-and-trade cases have been charged and resolved solely through civil SEC enforcement actions: *See e.g., S.E.C. v. Dorozhko*, 574 F.3d 42, 44 (2d Cir. 2009) (hacking into Thomson Financial Inc.); *See S.E.C. v. Igor Sabodakha*, Dkt. 19-cf-00505-MCA, Dkt. 86 (D.N.J) (hacking into SEC's EDGAR system); *S.E.C. v. David Kwon*, Dkt. 19-cf-00505-MCA, Dkt. 87 (D.N.J) (disgorging $165,474 of profits); *S.E.C. v. Andrey Sarafanov*, Dkt. 19-cf-00505-MCA, Dkt. 117 (D.N.J) (entering default judgment in the amount of $3,283,305 related to SEC EDGAR hack).

A review of the above cases also highlights the fact that in many instances Mr. Klyushin's conduct was less serious than many other defendants charged with similar crimes. For example, Mr. Klyushin was not a former Morgan Stanley vice president and FINRA license holder or a former registered broker-dealer whose trading skills were essential to any scheme's success. *See Khalupsky* and *Korchevsky, supra*.  Similarly, Mr. Klyushin did not use his computer skills to steal identities and infiltrate servers. *See Stone* and *Iermolovych*, *supra*.

Although Mr. Klyushin, in contrast to Arkadiy and Igor Dubovoy, asserted his unquestioned right to a jury trial where he required the government to meet its burden. Not only is this a permissible response to a criminal charge, but it advances the very societal interests that the Sixth Amendment was originally intended to serve. *See* Nat'l Ass'n of Criminal Defense Lawyers, *NACDL's Effort to Expose and Limit the Trial Penalty Garners Broad Support with the Launch of a National Reform Effort* (July 2018) (quoting John Gleeson, former U.S. District Judge) ("We have a system in which you do not get punished unless the government can prove you guilty beyond a reasonable doubt and to the extent that prosecutors are empowered to create

a world in which only the extreme risk assumers will exercise that right, we are getting close to extinguishing it."); NACDL, *The Trial Penalty* at 14 (2018) (quoting Thomas Jefferson) ("I consider [trial by jury] as the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution." (alteration in original). Mr. Klyushin did not testify, nor did he elicit any witness testimony that could fairly be characterized as incredible. Although he is not entitled to a decreased guideline for acceptance of responsibility, his decision to contest the government's proof should not otherwise enhance the sentence he would have received had he pled guilty.[9]

Additionally, Mr. Klyushin will face a longer term of confinement and a much more punitive prison environment based solely on his citizenship status. Indeed, Vladislav Khalupsky, a U.S. citizen, who was sentenced to a 48-month term of imprisonment served approximately 28-months at a prison camp within FCI Cumberland.[10]  Vitaly Korchevsky, a U.S. citizen who was sentenced to 60-months, is currently expected to be released less than 41 months after his self-surrender date and may be released in as little as 35 months to home confinement or a residential reentry facility.[11] Instead, Mr. Klyushin will serve almost his entire sentence and will continue to be in ICE custody following the conclusion of his sentence while he awaits deportation. *See*

---

[9] Indeed, based on the information in the defense's possession before trial, the defense made principled arguments and decisions to contest, *inter alia*, allegations of venue. The defense had no notice prior to trial or before the close of the defense's case that the government was seeking to establish venue through 18 U.S.C. § 3238.

[10] *See Khalupsky*, Dkt. 15-cr-00381-RJD, Dkt. 384 at 3 (ordered to self-report on March 11, 2019); *see also* Dkt 490 at 2 (released on June 9, 2021).

[11] Mr. Korchevsky was ordered to self-report on November 2, 2020, and is expected to be released on March 1, 2024. *See Korchevsky*, Dkt. 15-cr-00381-RJD, Sept. 21, 2020 Order; *see also* https://www.bop.gov/mobile/find_inmate. Korchevsky may be released as early as September 1, 2023, to serve the last 6-months of his sentence in home confinement or a at

*United States v. Redemann*, 295 F. Supp. 2d 887, 896 (E.D. Wis. 2003) (the court should make

sentencing allowances for a "defendant who faces more onerous conditions of confinement than

the typical defendant").

The below Guideline sentences in hack-and-trade cases are not outliers. Both nationally

and in the District of Massachusetts, insider trading defendants routinely receive sentences below

the Guidelines and are frequently given non-custodial sentences. Nationally, in 2022, 94.1% of

all defendants sentencing under §2B1.4, were sentenced below the guideline sentencing range.

*See* Sentence Imposed Relative to The Guideline Range for Economic Offense Offenders, 2022,

available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-

reports-and-sourcebooks/2022/TableE7.pdf. In this District, insider trading cases in general

result in sentences significantly below guidelines ranges, even for defendants who are convicted

at trial. *See United States v. McPhail*, 14-cr-10201-DJC (D. Mass. Sep. 18, 2015) (after being

convicted at trial of insider trading, the defendant faced guidelines of 51-63 months, which

included an obstruction enhancement. The Court found that the defendant was the "linchpin in

the success of the scheme" and "initiated passing on the information" to friends and colleagues—

he received 18 months' imprisonment); *United States v. Wang*, 16-cr-10268-IT, Dkt. 358 (D.

Mass. Nov. 13, 2018) (given 6 months with a Guidelines of 63-78 months after trial).

Indeed, courts have routinely imposed non-custodial or relatively short incarceratory

sentences in fraud cases where the conduct was ***more*** serious than the offense conduct here:

| CASE | GSR | SENTENCE | SUMMARY |
|---|---|---|---|
| *United States v. Prosperi*, 1:06-cr- | 87-108 | 6 months home | Defendant was convicted of mail fraud and conspiracy.  Defendant and his co- |

residential re-entry facility.

| | | | |
|---|---|---|---|
| 10116-RGS (D. Mass) (Stearns, J.) | | confinement, 3 years' probation | conspirators engaged in a years-long fraud scheme in which they provided concrete for the federally funded "Big Dig" construction project that did not meet required specifications, and created false documentation certifying compliance causing a loss in excess of $5 million.  Defendant was sentences to 3 years' probation and 6-month home confinement.  The First Circuit affirmed the sentence. *United States v. Prosperi*, 686 F.3d 32, 50 (1st Cir. 2012) |
| *United States v. Tighe*, 15-cr-62, 2018 WL 1307949 (E.D.N.Y Feb. 12, 2015) (Glasser, J.) | 135-168 | 6 months home confinement, 4 years' probation | Defendant, the president and owner of a medical drug repackaging corporation, pled guilty to introducing adulterated and misbranded drugs, which caused 21 patients to be injected with drugs from a lot contaminated by mold. |
| *United States v. Harkonen*, 08-cr-164 (N.D. Ca. Mar. 18, 2008) (Seeborg, J.) | 188-235 | 6 months home confinement, 4 years' probation | Defendant, the president and CEO of a pharmaceutical company, was convicted of misrepresenting the effectiveness of a drug as part of a scheme to defraud doctors into prescribing, dying patients into taking, and insurers into paying for the drug, which caused a loss of $32.1 million. |
| *United States v. Block*, 16-cr-595 (S.D.N.Y) (Oetken, J.) | Over 100 years | 18 months | Defendant, the former CFO of a publicly traded real estate investment trust, was convicted of manipulating the company's financial results by fraudulently inflating a key metric used by investors to evaluate Real Estates Investment Trusts. The fraud caused a loss in excess of $300 million to shareholders.  Defendant had otherwise led a law-abiding life and had been punished by the loss of his profession. |

In short, for more than four decades, Mr. Klyushin did everything right. He worked hard and founded multiple successful businesses. He started a family, becoming a dedicated husband and a loving father to five children. He was a consistently caring, helpful, and empathetic colleague and friend. The conduct at issue in this case should not outweigh a lifetime of good

deeds, hard work, kindness, and overall decency and humanity that Mr. Klyushin displayed time and time again.

## V.  Conclusion

For all the reasons articulated herein, and those to be advanced at the hearing, the defense respectfully submits that a sentence of imprisonment for no more than 36 months is fair, just, proportionate, and sufficient to meet the § 3553(a) sentencing objectives.  This sentence would certainly be "significant . . . to an offender," like Mr. Klyushin, "who has never been incarcerated [before]."  *United States v. Herink*, 2012 WL 3112002, at *8 (D. Neb. July 30, 2012). And there is "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders."  *Adelson*, 441 F. Supp. 2d at 514 (citing Richard Frase, *Punishment Purposes,* 58 Stanford L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998)).  These findings reflect the commonsense conclusion that no jail sentence is "short" to the human being who must spend his time confined to a correctional facility, separated from friends and loved ones.

Respectfully Submitted,
Vladislav Klyushin,
By His Attorneys,

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.
Mass. Bar No. 690826
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
menemtsev@gmail.com

**/s/ Marc Fernich**
Marc Fernich
Law Office of Marc Fernich
800 Third Avenue
Floor 20
New York, NY 10022
212-446-2346
Email: maf@fernichlaw.com

Dated: August 2, 2023

## CERTIFICATE OF SERVICE

I, Maksim Nemtsev, hereby certify that on this date, August 2, 2023, a copy of the foregoing documents has been served via Electronic Court Filing system on all registered participants.

**/s/ Maksim Nemtsev**
Maksim Nemtsev, Esq.